/FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUN 1 9 2014

for CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on June 19, 2014

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In re the Marriage of: | NO. 89093-5 |
| NEHA VYAS CHANDOLA, | EN BANC |
| Respondent, | |
| and | Filed __JUN 1 9 2014__ |
| MANJUL VARN CHANDOLA, | |
| Petitioner. | |

GORDON McCLOUD, J.—This case concerns three provisions of a parenting plan that limits contact between the petitioner, Manjul Varn Chandola, and his young daughter. The trial court imposed those restrictions under RCW 26.09.191(3)(g), which authorizes a court to "preclude or limit any provisions of the parenting plan" if necessary to protect against "adverse effect to the child's best interests." This case presents the question what type of "adverse effect to the child's best interests" a trial court must find before imposing parenting plan restrictions

under the catchall provision, RCW 26.09.191(3)(g). We hold that restrictions imposed under that statute must be reasonably calculated to prevent relatively severe physical, mental, or emotional harm to a child. Applying that standard, we affirm the trial court's decision to impose two of the challenged restrictions but reverse its decision to impose the third.

## FACTS

Manjul Varn Chandola (Chandola) and Neha Vyas Chandola (Vyas) were married in 1998; Vyas gave birth to the couple's daughter, P.R.C., in 2008. Both Chandola and Vyas are attorneys, but Chandola was consistently unemployed or underemployed during their marriage. Accordingly, he was home with P.R.C. more often than Vyas was during the first two years of P.R.C.'s life. At different intervals, both Vyas's mother and Chandola's parents also lived in the home. The grandparents provided a great deal of child care, and while Vyas and Chandola were married, P.R.C. always slept in the same room as either her parents or one of her grandmothers.

Chandola's and Vyas's most serious conflicts arose after P.R.C. was born. Vyas accused Chandola of engaging in abusive behavior towards her—yelling at her, calling her names, and telling her that she was a bad mother. She felt that Chandola and his parents were trying to marginalize her, encouraging P.R.C. to bond

2

with Chandola and minimizing Vyas's role. Vyas also objected to Chandola's parenting style. Particular sources of conflict were Chandola's inability to maintain a consistent meal and sleep schedule for P.R.C. and his obsessive concern that something bad would happen to her. According to Vyas, this concern manifested in Chandola's holding P.R.C. excessively, discouraging her from playing with other children, and insisting that she be supervised by a family member at all times—even while she slept.

In February 2011, Vyas filed for dissolution. She told Chandola that she was concerned about the possibility of sexual abuse because P.R.C. had complained of vaginal pain. When the couple separated in late February 2011, Chandola agreed to supervised visitation with P.R.C. at the advice of his attorney at the time. The supervised visitation was lifted in December 2011.

The court-appointed parenting expert, Dr. Jennifer Wheeler, concluded that P.R.C.'s statements were *not* evidence of sexual abuse. In its findings of fact, the trial court also dismissed the allegations, concluding instead that "[Vyas] may have needed to precipitate a crisis in order to escape the marriage and extended family dynamic." Clerk's Papers (CP) at 94. In short, the sexual abuse allegations were unsubstantiated.

In the divorce proceedings, Chandola sought a 50-50 residential split. Vyas requested that Chandola's residential time with P.R.C. be limited under RCW 26.09.191(3)(b) and (e), which allow a trial court to "preclude or limit any provisions of the parenting plan" upon certain findings. Subsection (3)(b) allows restrictions on the basis of a parent's "long-term emotional . . . impairment which interferes with . . . parenting functions." Subsection (3)(e) allows restrictions on the basis of a parent's "abusive use of conflict . . . which creates the danger of serious damage to the child's psychological development."[1]

---

[1] RCW 26.09.191(3) reads in full as follows:

A parent's involvement or conduct may have an adverse effect on the child's best interests, and the court may preclude or limit any provisions of the parenting plan, if any of the following factors exist:

(a) A parent's neglect or substantial nonperformance of parenting functions;

(b) A long-term emotional or physical impairment which interferes with the parent's performance of parenting functions as defined in RCW 26.09.004;

(c) A long-term impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting functions;

(d) The absence or substantial impairment of emotional ties between the parent and child;

(e) The abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development;

4

Dr. Wheeler's written pretrial parenting evaluation stated that there was no basis on which to impose RCW 26.09.191 restrictions. It acknowledged that Chandola appeared to have some problematic personality traits but concluded that they did not manifest frequently enough to "meet criteria for a major mental health or personality disorder that would support restrictions to the residential schedule consistent with RCW 26.09.191(3)(b)." 2 Verbatim Report of Proceedings (VRP) (Jan. 31, 2012) at 297.

Nevertheless, Dr. Wheeler recommended a residential schedule that limited Chandola to roughly the same total amount of contact he had had with P.R.C. during the period of supervised visitation (before the judge rejected the abuse allegations). The schedule she recommended amounted to about 20 hours per week (two seven-hour visits per week and one overnight stay every other Saturday). She also recommended a residential schedule in "phase[s]," whereby Chandola would progress to greater residential time with P.R.C. every few years if he successfully complied with certain recommendations. *Id.* at 235-45. These recommendations were fairly limited: Dr. Wheeler recommended that Chandola continue to see his

---

(f) A parent has withheld from the other parent access to the child for a protracted period without good cause; or

(g) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

therapist and participate in individual parent training but did not recommend any restrictions on Chandola's conduct or his parents' contact with P.R.C.

At trial, Dr. Wheeler agreed that her recommendations gave Chandola time with P.R.C. that was "significantly more limited than what would generally be the norm." *Id.* at 305. When pressed to explain these recommendations on the witness stand, Dr. Wheeler disavowed her written evaluation to some extent:

> I also don't think I gave due consideration in my formulation of the .191 restrictions to what my concerns were and how they might play out in terms of abusive use of conflict. I was very focused as I read it here on domestic violence, sexual abuse allegations and the emotional impairment.
>
> My authority for my opinion is that the personality traits that I've been describing all morning in my opinion, the risk to [P.R.C.] of those traits is ongoing conflict that is essentially emotionally abusive to her. And I do think that until those traits are better regulated and [Chandola is] able to interact with [P.R.C.] in a way that does not perpetuate this conflict and parent in a way that does not continue to inflame this conflict, I do think that [the] father is vulnerable to engaging in abusive use of conflict. That supports generally why I am limiting his residential schedule relative to what you just referred to as the normal, typical kind of recommendation.

*Id.* at 305-06.

After six days of testimony, the trial court found that "the father's parenting history has had an adverse effect on the child's best interests pursuant to RCW 26.09.191(3)(g)." CP at 80. Unlike RCW 26.09.191(3)(b) and (e)—the provisions that Vyas invoked in her brief to the trial court, which specifically address a parent's

emotional impairment and abusive use of conflict—RCW 26.09.191(3)(g) is a catchall provision. It allows courts to "preclude or limit any provisions of the parenting plan" in light of "[s]uch other factors or conduct as the court expressly finds adverse to the best interests of the child." RCW 26.09.191(3)(g). In accordance with its finding of adverse effect, the trial court placed several restrictions and conditions on Chandola's contact with P.R.C.

Thus, the court's parenting plan provided for a residential schedule in three stages. The first stage, which was to last approximately two and a half years, allows Chandola to have P.R.C. for one seven-hour visit every Tuesday evening, one overnight stay every other Thursday, and one overnight stay every other weekend. The second stage, which is to last from August 1, 2014 until P.R.C. entered the third grade, increases Chandola's residential time with P.R.C. to one overnight stay per week and a full Friday afternoon through Sunday evening stay every other weekend. The third and final stage allows Chandola to have P.R.C. stay every Thursday night and every other weekend from Friday after school until Monday morning.

Under the terms of this plan, each new stage commences only if Chandola has complied with several conditions designed to improve his parenting skills:

> The parties shall only progress to the next stage if the father has routinely abided by the mother's bedtime routine and time (unless otherwise recommended by the case manager); the child sleeps in her own room at the father's house (unless otherwise recommended by the

case manager); the father has remained compliant with counseling requirements; the father has successfully completed parent training; the father has abstained from discussing the case or any disputed facts/claims in the case with the child; the father has complied with the restrictions regarding paternal grandparent contact in Section 3.10; and the father has complied with any and all recommendations by the child's therapist, the parent trainer, and the case manager. If the parties disagree about the father's compliance with these conditions to progress to the next phase of residential time, the father may (within two months of the dates for potential progress to the next phase) bring a motion on the family law motions calendar with at least 14 days notice to the mother to resolve the disagreement.

CP at 81. The "restrictions regarding paternal grandparent contact," *id.*, are as follows:

> For Stage 1 and 2 the father shall not facilitate or allow either paternal grandparent to be present during the father's residential time except as follows: either or both paternal grandparents may be present up to 20% total of the father's time in any given calendar year. However the grandparents should not be present for any parenting observations, training or coaching sessions. During the 20% time the father may leave the child with the grandparents i.e. he need not be present. This provision shall not be construed to create a right or entitlement for grandparent visitation but is intended to maintain the child's connection with her paternal grandparents while promoting direct parenting by the father without the presence of the grandparents. The father shall notify the mother and case manager in advance of any time his parents visit.

CP at 84.

Chandola appealed, arguing that his parenting behaviors did not have the kind of "adverse effect" on P.R.C. that the legislature required in RCW 26.09.191(3). He also sought attorney fees. The Court of Appeals affirmed, and Chandola petitioned

8

this court for review. *In re Marriage of Chandola*, noted at 174 Wn. App. 1073, *review granted*, 179 Wn.2d 1008, 315 P.3d 531 (2013). Vyas cross-petitioned this court for attorney fees on appeal.

ANALYSIS

*Standard of Review*

A trial court's parenting plan is reviewed for an abuse of discretion, which "occurs when a decision is manifestly unreasonable or based on untenable grounds or untenable reasons." *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012) (citing *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)). The trial court's findings of fact are treated as verities on appeal, so long as they are supported by substantial evidence. *Id.* (citing *Ferree v. Doric Co.*, 62 Wn.2d 561, 568, 383 P.2d 900 (1963)). "Substantial evidence" is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted. *Id.*

While a parenting plan is reviewed for abuse of discretion, the trial court's discretion is cabined by several provisions in chapter 26.09 RCW, including the catchall provision at issue in this case: RCW 26.09.191(3)(g). *Id.* at 35-36. As noted above, RCW 26.09.191(3) bars the trial court from "preclud[ing] or limit[ing] any provisions of the parenting plan" (i.e., restricting parental conduct) unless the

evidence shows that "[a] parent's . . . conduct may have an adverse effect on the child's best interests."

Chandola makes two general arguments regarding the trial court's ruling and the Court of Appeals' decision. First, he argues that the trial court improperly relied on conditions that existed during the year before trial only because of Vyas's unfounded allegations of abuse. Second, he argues that the trial court applied an incorrect standard when it found an "adverse effect" justifying restrictions on parent-child contact. RCW 26.09.191(3).

For the reasons given below, we disagree with Chandola's first argument—we find that the trial court did not rely at all on the discredited abuse allegations or on conditions resulting from those allegations. With regard to Chandola's second argument, we take this opportunity to clarify the level of "adverse effect" necessary to sustain parenting plan restrictions under RCW 26.09.191(3)(g)'s catchall provision: that adverse effect must be similar in severity to the adversity illustrated by that subsection's neighboring provisions, RCW 26.09.191(a)-(f).

Applying that standard, we affirm the Court of Appeals' decision to uphold the restrictions on residential time and cosleeping. With respect to the third restriction (the limit on grandparental contact), however, we find that the trial court

abused its discretion. We therefore reverse the Court of Appeals' decision to uphold that restriction.

I.   The Trial Court Did Not Improperly Rely on Conditions That Resulted from the Unfounded Abuse Allegations

Chandola first argues that the trial court improperly relied on the unfounded abuse allegations in two ways: (1) by crediting the court-appointed expert's relatively negative assessment, based on an in-home observation, of what Chandola contends was the "artificial environment" created by supervised visitation (imposed in the wake of the later-rejected sexual abuse allegations) and (2) by attributing P.R.C.'s improved social skills to her reduced contact with Chandola (and denying Chandola the opportunity to prove that his parenting skills had improved). Pet. for Review at 16-18. We are not persuaded.

The record shows that the trial court based its decision on conditions that existed before the allegations, before the separation, and before the supervised visitation—not on conditions that existed during the parenting expert's home visits. *See* CP at 92 ("Prior to separation the father consistently engaged in a pattern of interaction with [P.R.C.] which . . . lacked, in concerning degree, objectivity with respect to her healthy development."). The court did note that P.R.C.'s socialization had improved after her father's influence was reduced, but that is not unfair reliance on the conditions resulting from the unfounded abuse allegations. Rather, it is a

11

reasonable assessment of the facts that existed at trial, which is well within the court's discretion.

As for Dr. Wheeler's in-home observation, it is true that she noted the "high energy" tenor of the observation. RP (Jan. 31, 2012) at 215-17. But this was due to Chandola's own behavior, rather than any fact that resulted from supervised visitation itself. *Id.* at 215 ("there was a lot more activity, a lot more energy . . . in part because of the number of people but also in part because father's style is very high energy"). Moreover, this observation does not appear to have played any significant role in the trial court's decision, which omitted any reference to Chandola's postseparation interactions with P.R.C.

II.    Restrictions Imposed under RCW 26.09.191(3)(g) Must Be Reasonably Calculated To Prevent Physical, Mental, or Emotional Harm to the Child

There is some overlap between the trial court's authority under RCW 26.09.187, to establish the terms of the parenting plan, and its authority under RCW 26.09.191(3), to "preclude or limit any provisions of the parenting plan." Practically speaking, a court can substantially restrict a parent's contact with his or her child simply by establishing a residential schedule pursuant to its discretion under RCW 26.09.187.

But that is not what the court did with the challenged restrictions here; instead, it proceeded under RCW 26.09.191(3). The "limitations" in that statute are

fundamentally different from the provisions necessary to every parenting plan under RCW 26.09.187. Restrictions on a parent's geographic location, for example, are not authorized as typical parenting plan provisions under RCW 26.09.187. *See Littlefield*, 133 Wn.2d at 54-55; LAWS OF 2000, ch. 21. They are instead imposed under RCW 26.09.191(3). Similarly, restrictions on a parent's travel or conduct can be imposed only under RCW 26.09.191—not as features of the parenting plan under RCW 26.09.187. *Katare*, 175 Wn.2d at 35-37; *In re Marriage of Wicklund*, 84 Wn. App. 763, 770-72, 932 P.2d 652 (1996).

Before imposing RCW 26.09.191(3)(g) restrictions, a trial court must find "'more than the normal . . . hardships which predictably result from a dissolution of marriage.'" *Katare*, 175 Wn.2d at 36 (alteration in original) (quoting *Littlefield*, 133 Wn.2d at 55). While the court "need not wait for actual harm to accrue before imposing restrictions," it may impose restrictions only where substantial evidence shows "'that a danger of . . . *damage* exists.'" *Id.* at 35-36 (emphasis added) (alteration in original) (quoting and citing *In re Marriage of Burrill*, 113 Wn. App. 863, 872, 56 P.3d 993 (2002)).

With respect to the level of harm required for restrictions under RCW 26.09.191(3)(g), Chandola makes two arguments. First, he urges this court to interpret RCW 26.09.191(3)(g) to impose a standard analogous to that applied in

nonparental custody proceedings. Under that approach, a trial court could not impose restrictions under RCW 26.09.191(3)(g) unless it found that a parent was incapable of "meet[ing] a child's basic needs" or that the restrictions were necessary to avoid "'actual detriment to [a] child's growth and development.'" *In re Custody of B.M.H.*, 179 Wn.2d 224, 235-36, 315 P.3d 470 (2013) (construing chapter 26.10 RCW, which governs nonparental actions for child custody (quoting *In re Custody of Shields*, 157 Wn.2d 126, 143, 136 P.3d 117 (2006))). Second, Chandola contends that where the parents' "differing views can both be accommodated" without the imposition of RCW 26.09.191(3) restrictions, any such restriction should be subject to strict scrutiny. Suppl. Br. of Pet'r at 2. Chandola contends that both of his arguments are compelled by the due process clause of the Fourteenth Amendment to the United States Constitution, which protects a parent's fundamental right to "autonomy in parenting." *Id.* at 5.

We decline to analogize parenting plan restrictions to nonparental petitions for custody. The nonparental custody statutes are designed to address situations wholly different from a divorce. A restriction imposed under RCW 26.09.191(3) might be relatively minor—for instance, as here, a parent might be required to attend parenting classes—but the result sought in a nonparental custody petition is the

termination of parental custody. Thus, the legislature would likely disagree with Chandola's analogy.

We also decline to subject Chandola's parenting plan to strict scrutiny. To be sure, the right to parental autonomy is a "'fundamental liberty interest protected by the Fourteenth Amendment,'" and the State may not intrude upon it absent a compelling interest and narrow tailoring. *In re Custody of Smith*, 137 Wn.2d 1, 14-15, 969 P.2d 21 (1998) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)). Strict scrutiny therefore applies to the state's infringement on parental autonomy in favor of a *nonparent's* interest. But it does not apply in a proceeding characterized by the "equivalent parental positions of the parties." *In re Parentage of L.B.*, 155 Wn.2d 679, 710, 122 P.3d 161 (2005).[2]

But RCW 26.09.191(3)(g) does require a particularized finding of a specific level of harm before restrictions may be imposed. Two principles of statutory interpretation compel this conclusion.

First, the disputed catchall provision, RCW 26.09.191(3)(g), follows a list of specific "factors" that "may have an adverse effect on the child's best interests,"

---

[2] This court has reached the same conclusion in numerous prior cases. *See, e.g.*, *Katare*, 175 Wn.2d at 42 (strict scrutiny has no application to parenting plan, because adverse parties have equivalent interests); *Parentage of L.B.*, 155 Wn.2d at 710 (same).

15

justifying restrictions on parent-child contact. RCW 26.09.191(3)(a)-(f). When a statute employs such a general catchall term in conjunction with specific terms, the general term is "deemed only to incorporate those things similar in nature or 'comparable to' the specific terms." *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 151, 3 P.3d 741 (2000) (quoting *John H. Sellen Const. Co. v. Dep't of Revenue*, 87 Wn.2d 878, 883-84, 558 P.2d 1342 (1976)). In RCW 26.09.191(3), all of the factors specifically listed concern either the lack of any meaningful parent-child relationship whatsoever or conduct by the parent that seriously endangers the child's physical or emotional well-being:

> A parent's involvement or conduct may have an adverse effect on the child's best interests, and the court may preclude or limit any provisions of the parenting plan, if any of the following factors exist:
>
> (a) A parent's neglect or substantial nonperformance of parenting functions;
>
> (b) A long-term emotional or physical impairment which interferes with the parent's performance of parenting functions as defined in RCW 26.09.004;
>
> (c) A long-term impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting functions;
>
> (d) The absence or substantial impairment of emotional ties between the parent and the child;
>
> (e) The abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development;

(f) A parent has withheld from the other parent access to the child for a protracted period without good cause.

Consistent with the nature of these specific terms, trial courts typically invoke the catchall provision in RCW 26.09.191(3)(g) only after identifying a specific, and fairly severe, harm to the child.[3]

Second, statutory language is to be interpreted in context, considering "'related provisions, and the statutory scheme as a whole.'" *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010) (quoting *State v. Engel*, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009)). Thus, RCW 26.09.191(3)(g) must be read in light of chapter 26.09 RCW's statement of policy, codified at RCW 26.09.002. It provides that "the best interest of the child is ordinarily served when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as *required to protect the child from physical, mental, or emotional harm*." RCW 26.09.002 (emphasis added).

---

[3] *E.g.*, *Katare*, 175 Wn.2d at 38 (permitting travel restrictions on the basis of evidence that father posed a risk of abduction). Courts have also relied on RCW 26.09.191(3)(g) to impose visitation restrictions designed to prevent young children from spending large amounts of time in transit. *E.g.*, *In re Marriage of Fahey*, 164 Wn. App. 42, 67-68, 262 P.3d 128 (2011).

17

In light of this policy, as well as the nature of the specific grounds for parenting plan restrictions listed RCW 16.09.191(3)(a)-(f), we conclude that the legislature intended RCW 26.09.191(3) restrictions to apply only where necessary to "protect the child from physical, mental, or emotional harm," RCW 26.09.002, similar in severity to the harms posed by the "factors" specifically listed in RCW 26.09.191(3)(a)-(f). A trial court abuses its discretion if it imposes a restriction that is not reasonably calculated to prevent such a harm.

III.    The Trial Court Did Not Abuse Its Discretion by Limiting Chandola's Residential Time with P.R.C. or by Prohibiting Cosleeping; the Trial Court Did Abuse Its Discretion by Restricting P.R.C.'s Contact with Her Paternal Grandparents

Chandola challenges three restrictions imposed by the trial court: (1) the limitation of his residential time with P.R.C. to one overnight stay and one evening visit per week,[4] (2) the prohibition on cosleeping, and (3) the restriction on P.R.C.'s contact with her paternal grandparents. The trial court did not abuse its discretion by imposing the first two restrictions: the record shows that they were reasonably calculated to prevent physical, mental, or emotional harm to P.R.C. The trial court

---

[4] The trial court imposed the restrictions on Chandola's residential time with P.R.C. under RCW 26.09.191(3)(g). *See* CP at 93 ("It is . . . necessary to impose such *restrictions* as may best be anticipated [to] assure the mother's parenting is not diluted by the father. Certainly a 'fifty/fifty' parenting plan would not accomplish this." (emphasis added)).

did abuse its discretion, however, by restricting P.R.C.'s contact with her paternal grandparents.

> *A. The trial court did not abuse its discretion by limiting Chandola's residential time with P.R.C.*

Vyas asserts that "the trial focused [primarily] on [Chandola]'s parenting deficits and troubling personality traits" and that both the court-appointed expert, Dr. Susan Wheeler, and the father's expert witness, Dr. Marsha Hedrick, agreed that these deficits and traits were grounds to limit Chandola's parenting time. Resp't's Suppl. Br. at 2-3. There is ample support for this assertion in the record.

The "deficits" and "traits" to which Vyas refers all involved Chandola's inability to provide P.R.C. with a proper diet, sleep schedule, or socialization. *Id.* Vyas testified that when she was working full time, she would often arrive home in the evening to find that Chandola had not yet fed P.R.C. lunch, or that he had fed her only a cookie or donut. She also stated that Chandola persistently and "randomly" woke P.R.C. up during the night to hold her, and that he would often be unable to eat or wash himself while Vyas was at work because he could not bring himself to put P.R.C. down. 3 VRP (Feb. 1, 2012) at 410-12.

Several family friends testified to similar concerns, particularly relating to Chandola's constant holding of P.R.C., which prevented her from exploring and socializing, and to his refusal to establish a sleep or meal schedule for her. Indeed,

19

even one of Chandola's lay witnesses testified about Chandola's tendency to hold P.R.C. too much and to perceive himself as persecuted by friends and family who suggested that he alter his parenting practices. The common theme that emerged from the various witness' testimony was that prior to the separation (before Chandola's contact with P.R.C. was restricted) P.R.C. had been a fearful and sleep-deprived child.[5]

Dr. Wheeler testified that she believed Chandola's "obsessive compulsive," overly protective parenting style appeared to be a means of "regulating his own anxiety versus recognizing what's really best for [P.R.C.]." 2 VRP (Jan. 31, 2012) at 189. She made similar comments about Chandola's habit of feeding P.R.C. milk at night, which was contrary to both Vyas's wishes and P.R.C.'s pediatrician's advice. Dr. Wheeler indicated that this was unhealthy for P.R.C. but done because it "felt good" to Chandola. *Id.* at 191.

Ultimately, Dr. Wheeler recommended that P.R.C. have very limited residential time with Chandola because:

> . . . I feel like the personality traits that I observed, while they didn't rise to the level to be consistent with .191 restrictions from the emotional impairment standpoint, I do have concerns that right now his

---

[5] One of Chandola's lay witnesses contradicted this testimony, but credibility determinations are for the trial court. *Chatwood v. Chatwood*, 44 Wn.2d 233, 240, 266 P.2d 782 (1954) (trial judge better positioned than appellate court to weigh evidence and credibility in custody proceeding).

20

skills are not sufficient to be able to overcome some of those personality problems and exhibit skills where he's kind of mastered some of these deficits that he has right now that would bring him up to the level of being a good enough parent that would warrant having equivalent access.

. . . .

. . . So that's why I'm recommending these kind of lengthy times that they can spend together and have very enriched, rewarding time together where they can accomplish a lot of parent-child tasks to help foster and maintain the relationship that they already have, but without unduly exposing her to some of these more problematic traits until these can kind of be better regulated.

*Id.* at 235-37. Significantly, Dr. Hedrick testified that she shared Dr. Wheeler's concerns about the nighttime bottle feeding, overly protective parenting, lack of structure, and lack of empathy. She agreed that Chandola's "difficulties understanding normal child development"—particularly his need to hold P.R.C. instead of letting her explore—were cause for concern. 3 VRP (Feb. 1, 2012) at 492-93.

Dr. Hedrick testified at length about the legitimacy of Dr. Wheeler's report and recommendations. She stated that she considered Dr. Wheeler's written report to be fundamentally sound but also thought that Dr. Wheeler should have recommended more visitation time for Chandola and P.R.C. Dr. Hedrick testified that in order to protect P.R.C.'s relationship with Chandola, the court would need to allow at least one overnight stay per week. The residential schedule ultimately

imposed by the trial court met this criterion. (Dr. Wheeler's recommended schedule afforded Chandola only one overnight stay every other week.)

In light of this record, we conclude that the trial court did not abuse its discretion by imposing restrictions on Chandola's residential time with P.R.C. Contrary to Chandola's assertions, the trial court's concerns were not simply a matter of parenting "style." Suppl. Br. of Pet'r at 14. Rather, they involved fundamental human needs: sleep, nutrition, and socialization. The trial court's written findings make clear that it believed P.R.C. had made substantial emotional and social progress since her parents' separation (which reduced her time with Chandola): "It is telling that subsequent to separation the child's behavior repertoire increased dramatically. As more than one lay witness observed since separation '[P.R.C.] is a changed child, more outgoing, interactive.'" CP at 92-93 (citations omitted).

In imposing the residential restrictions, the trial court clearly intended to ensure that this progress continue unhindered. There is substantial evidence in the record to support the conclusion that these restrictions were reasonably calculated to accomplish that end. We therefore affirm the Court of Appeals' decision upholding the parenting plan's residential schedule.

> *B. The trial court did not abuse its discretion when it prohibited Chandola from cosleeping with P.R.C.*

22

Vyas contends, and we agree, that the cosleeping restriction was imposed so that P.R.C. could maintain a consistent sleep schedule—and not because of any innate distrust of cosleeping.

Vyas testified that Chandola's method of putting P.R.C. to bed was to show her YouTube videos, sometimes until one or two in the morning, and that P.R.C. was chronically sleep deprived as a result. She also testified that Chandola could not resist picking P.R.C. up in the middle of the night and that Vyas therefore believed that cosleeping was unhealthy for both Chandola and P.R.C. The trial court apparently found this testimony credible.[6]

Chandola concedes that sleep deprivation is a harm justifying RCW 26.09.191(3)(g) restrictions. He argues that the cosleeping prohibition was improper only because it was not *narrowly tailored* to prevent that harm. He contends that the court should simply have prohibited him from picking P.R.C. up while she slept, instead of prohibiting cosleeping altogether. He asserts that the blanket prohibition "forced [him] and P.R.C. to violate the standards of their culture." Suppl. Br. of Pet'r at 20.

---

[6] With respect to the cosleeping issue, Dr. Wheeler made no recommendation other than to "comply[] with the parent trainer recommendations versus abiding by what the mother wants." 2 VRP (Jan. 31, 2012) at 241.

23

As explained above, parenting plan provisions are not subject to strict scrutiny and thus need not be narrowly tailored. Instead, restrictions imposed under RCW 26.09.191(3) need only be reasonably calculated to prevent the kind of harm described above. Thus, Chandola's narrow tailoring argument fails.

Without doubt, a trial court must consider cultural factors when imposing a parenting plan. *In re Parentage of Jannot*, 149 Wn.2d 123, 127, 65 P.3d 664 (2003) ("parenting plans are individualized decisions that depend upon a wide variety of factors, including 'culture, family history, the emotional stability of the parents and children, finances, and any of the other factors that bear upon the interests of the children'" (quoting *In re Parentage of Jannot*, 110 Wn. App. 16, 20, 37 P.3d 1265 (2002))). In this case, the court heard testimony from both parents regarding their positive assessment of cosleeping before it prohibited Chandola from continuing that practice. But the court also considered testimony that P.R.C. was sleep deprived and only then determined that the cosleeping prohibition was necessary. It also preserved flexibility, ordering that the prohibition be enforced "unless otherwise recommended by the case manager." CP at 81.

The cosleeping restriction was therefore reasonably calculated to prevent mental and physical harm to P.R.C. We therefore affirm the Court of Appeals' decision to the extent that it upholds this restriction.

C. *The trial court abused its discretion when it ordered that Chandola's parents be present for no more than 20 percent of Chandola's residential time with P.R.C.*

Unlike the other two restrictions challenged in this case, the restriction on grandparental contact does not meet the RCW 26.09.191(3) standard. Vyas asserts that the trial court imposed this restriction because "the presence of [Chandola]'s parents prevented [Chandola] from developing the necessary parenting skills and contributed to conflict by demeaning and devaluing [Vyas]." Resp't's Suppl. Br. at 14.

There is ample support in the record for the conclusion that prior to the separation, Chandola and his parents had diminished Vyas's role in the family and coached P.R.C. to choose her father over her mother. There is also ample support for the conclusion that Chandola relied on his parents to care for P.R.C. But neither conclusion warrants the imposition of the trial court's third restriction.

Assuming that Chandola's parents did undermine Vyas's bond with P.R.C., the severe restrictions on Chandola's parenting time are more than sufficient to remedy this harm. Nothing in the record suggests that Chandola and his parents could continue to diminish Vyas's role after she became the primary custodial parent.

With respect to Chandola's reliance on his parents, we are unable to discern what harm the trial court believed this was causing P.R.C. The trial court did not identify any particular harm in its ruling; it opined only that Chandola—the father, not the child—was insufficiently independent:

> [Chandola]'s opportunities to parent and to learn from the opportunities must in large part be without the presence of his parents. The court recognizes that there are several cultural aspects to the history of the marriage and these may or may not include the paternal grandparents [sic] approach and influence. Or it may be due to [Chandola] being an only child, or likely a combination of both. Whatever the antecedents of the extended family dynamic the so called "team" approach at this time needs to stop. Therefore [Chandola]'s residential time must exclude his parents with occasional exceptions. . . .

CP at 93-94.

This ruling is a statement of opinion. It is an opinion that a father—an "only child" of Indian "cultural . . . history"—relies too much on "extended family" to help him raise his child. *Id.* That opinion is not sufficient to support RCW 26.09.191(3)(g) restrictions. It is not a finding that P.R.C. was at risk of a physical, mental, or emotional harm comparable to the harms inherent in the factors listed in RCW 26.09.191(3)(a)-(f).

Indeed, the facts here compel the opposite conclusion. The record contains no evidence that Chandola's reliance on his parents was causing P.R.C. to go unfed, unwashed, or otherwise uncared for. Instead, it shows that Chandola's mother was

a doting grandmother who carefully attended to P.R.C.'s needs.[7] The restriction on grandparent contact thus appears calculated to increase Chandola's independence rather than to prevent mental, physical, or emotional harm to P.R.C. This is not permitted under RCW 26.09.191(3)(g).

Any other conclusion leaves families vulnerable to a trial court's biases. By requiring trial courts to identify specific harms to the *child* before ordering parenting plan restrictions, RCW 26.09.191(3) prevents arbitrary imposition of the court's preferences. *Wicklund*, 84 Wn. App. at 770-71 (distinguishing trial court's disapproval of homosexuality from a finding of harm sufficient to justify parenting plan restrictions (citing *In re Marriage of Cabalquinto*, 43 Wn. App. 518, 519, 718 P.2d 7 (1986))). This is particularly important in the family law context, where the trial court is empowered to regulate intimate aspects of the parties' lives. *See Santosky*, 455 U.S. at 762-63 (noting that in the family law context minority groups are particularly "vulnerable to judgments based on cultural or class bias[es]").

We do not mean to imply that the trial court here was motivated by bias or cultural insensitivity; we conclude only that it did not justify the restriction on

---

[7] If Chandola's basic parenting skills remained deficient after the separation, P.R.C. might be harmed if her grandmother were absent and Chandola could not independently provide for her basic needs. But the court-ordered "in-home" parent training is presumably sufficient to address that hypothetical harm. CP at 90. If it were not, then P.R.C. would certainly be *harmed*, rather than protected, by the restriction on grandparent contact.

27

grandparent contact with the finding of relatively severe harm required by RCW 26.09.191(3)(g). We therefore reverse the portion of the Court of Appeals' decision that upholds the restriction on grandparent contact.

IV.    Neither Party Is Entitled to Attorney Fees or Costs

Both parties request attorney fees under RCW 26.09.140, which permits an appellate court to award costs and/or fees after "considering the financial resources of both parties."[8]    Vyas also requests fees on the basis of Chandola's alleged intransigence. A party's "intransigence" is an equitable as opposed to statutory basis for awarding attorney fees. *In re Marriage of Greenlee*, 65 Wn. App. 703, 708-09, 829 P.2d 1120 (1992).    We affirm the Court of Appeals' decision denying Chandola's request and deny both parties' requests for attorney fees in this court.

*A. Neither party is entitled to attorney fees under RCW 26.09.140*

RCW 26.09.140 provides that "[u]pon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." This statute applies only

---

[8] Under Rules of Appellate Procedure (RAP) 18.1, a party has a right to recover reasonable attorney fees or expenses on review in the Supreme Court if authorized by law, and if the party has put the request in his or her opening brief. *State ex rel. M.M.G. v. Graham*, 159 Wn.2d 623, 637-38, 152 P.3d 1005 (2007). Chandola did not request attorney fees in his briefs to this court, but under RAP 18.1(b) "[r]equests made at the Court of Appeals will be considered as continuing requests at the Supreme Court . . . ."

to dissolution proceedings and "invest[s] appellate courts with discretion to order a party to pay fees and costs to the opposing party [after] consider[ation] of financial circumstances." *In re Marriage of Rideout*, 150 Wn.2d 337, 357, 77 P.3d 1174 (2003).

This court has awarded attorney fees under RCW 26.09.140 where the requesting party demonstrated "disparity in [the parties'] income." *In re Marriage of Buecking*, 179 Wn.2d 438, 455, 316 P.3d 999 (2013). It has also denied fees on the basis that the requesting party did not "substantially prevail[] on appeal." *In re Marriage of McCausland*, 159 Wn.2d 607, 622, 152 P.3d 1013 (2007). Here, neither party satisfies those requirements.

First, Chandola challenged three conditions imposed in the parenting plan and prevailed as to one. Thus, neither party here has "substantially prevailed" before this court. *See State v. Nolan*, 141 Wn.2d 620, 626, 8 P.3d 300 (2000) (citing RAP 14.2 and collecting cases; noting that "when both parties prevail on major issues, there may be no substantially prevailing party").

Second, the record in this case does not establish a disparity in the parties' income that would justify an award of fees to either party. Vyas, who is employed full time, receives roughly $1,000 per month in child support payments and preschool tuition from Chandola, who is currently seeking full time work.

The parties appear to have roughly equivalent savings. Both cite financial hardship. Vyas states that she is in debt for dental bills and that her mortgage exceeds the value of her home. Chandola points out that he has had to bear 90 percent of the costs of the supervised visitation, has paid for counseling as a result of the unfounded sexual abuse allegations, and is underemployed. Both parties assert that the other receives substantial support from his or her parents. The financial affidavits submitted indicate that both have relied fairly heavily on support from family to fund this litigation.

Based on this record, we deny both parties' requests for discretionary attorney fees under RCW 26.09.140.

### B. Chandola's alleged "intransigence" does not justify an award of fees to Vyas

"'Awards of attorney fees based upon the intransigence of one party have been granted when the party engaged in "foot-dragging" and "obstruction" . . . or simply when one party made the trial unduly difficult and increased legal costs by his or her actions.'" *Katare*, 175 Wn.2d at 42 (alteration in original) (quoting *Greenlee*, 65 Wn. App. at 708). This court denied the mother's request for attorney fees in *Katare*, even though the petitioner in that case "repeatedly reasserted arguments that had been rejected" over the course of three separate appeals. *Id*. at 43 (Chambers, J., concurring). Despite Vyas's contrary views, Chandola has not engaged in behavior

30

like that of the petitioner in *Katare*. His arguments to this court are less extreme and fewer in number than those he advanced in the Court of Appeals. Moreover, he prevailed on one of them. We therefore deny Vyas's request for attorney fees on the basis of intransigence.

## CONCLUSION

Trial courts have broad discretion to create parenting plans tailored to the needs of the individuals involved in a particular dissolution. This discretion promotes finality, preventing "extended litigation [that] can be harmful to children." *Jannot*, 149 Wn.2d at 127. It also vests appropriate authority in the trial court, which is best situated to "assign the proper weight to each of the varied factors" relevant to a particular case. *Id*. (emphasis omitted).

But while trial courts have broad discretion in the context of a parenting plan, that discretion must be exercised within the bounds of the applicable statutes. Here, the applicable statute is RCW 26.09.191(3)(g). It permits parenting plan restrictions only when they are reasonably calculated to prevent relatively severe physical, mental, or emotional harm to the child.

Two of the three challenged restrictions in this case satisfy that standard—the residential provisions and cosleeping prohibition. We therefore affirm the Court of Appeals' decision upholding these restrictions. The third challenged restriction—

31

limiting the child's contact with her paternal grandparents—does not. We therefore reverse the Court of Appeals' decision upholding that restriction.

_____
Gordon McCloud, J.

WE CONCUR:

_____


_____


_____                    _____
                                                     Wiggins, J.

_____                    _____
                                                     González, J.

_____                    _____
Fairhurst, J.                                        Kulik, J.P.T.

No. 89093-5

OWENS, J. (dissenting) — One of the most important and difficult responsibilities of our judicial system is adjudicating family law cases. This burden falls heaviest on our trial court judges, who personally oversee these deeply emotional proceedings. The decisions they face "are difficult at best," which is why this court has repeatedly instructed that those decisions should "seldom be changed upon appeal." *In re Marriage of Landry*, 103 Wn.2d 807, 809, 699 P.2d 214 (1985). The emotional and financial interests of the families "are best served by finality." *Id.* Therefore, when reviewing trial court decisions in family law cases, "[a]ppellate courts *should not encourage appeals by tinkering with them.*" *Id.* (emphasis added). In this case, the majority oversteps its role as a reviewing court and improperly substitutes its judgment for that of the trial court. I respectfully dissent.

ANALYSIS

A trial court has wide discretion to set the terms of a parenting plan, and we will not reverse its decision unless we find that it abused its discretion. *In re Marriage of Littlefield*, 133 Wn.2d 39, 46, 940 P.2d 1362 (1997). An abuse of discretion occurs when a trial court's "decision is manifestly unreasonable or based on untenable grounds or untenable reasons." *Id.* at 46-47. "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard." *Id.* at 47. A court's decision "is based on untenable grounds if the factual findings are unsupported by the record." *Id.* A court's decision "is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." *Id.*

In this case, the trial judge presided over a trial that lasted more than a week and heard testimony from many witnesses, including family members, friends, and multiple parenting experts. Ultimately, the evidence showed that the father, Manjul Varn Chandola, lacked necessary parenting skills and suffered from problematic personality traits. The trial judge expressly found that the father's conduct was "adverse to the best interests of the child." Clerk's Papers (CP) at 92. The trial judge found that Chandola "was unwilling or unable to establish boundaries, routines, schedules, and structure" and that he "discouraged exploration and independence." *Id.* The trial judge also found that Chandola was unable to recognize many of the

2

issues with his parenting. This was consistent with the parenting expert's finding that Chandola had difficulty "integrating data inconsistent with his view of reality." *Id.* at 93.

To address the issues with Chandola's lack of parenting skills, the trial judge imposed "such restrictions as may best be anticipated [to] assure the mother's parenting is not diluted by the father." *Id.* The court imposed restrictions "designed to address increased awareness" for the father but also give him the opportunity to parent regularly. *Id.* The court expected that this would allow evaluation of "his judgment and reasoning with regard to parenting decisions." *Id.* The majority does not object to most of the restrictions imposed by the trial court, including requiring the father to:

- Abide by the mother's bedtime routine and time;
- Have his daughter sleep in her own room when at his house;
- Comply with counseling requirements;
- Complete parent training;
- Abstain from discussing this court case with his daughter; and
- Comply with any recommendations made by the child's therapist, the parent trainer, and the case manager.

I agree with the majority that the trial court is allowed to impose these restrictions, which were designed to prevent immediate harm to Chandola's daughter and also *improve his parenting skills* so that he would be able to increase his time with her in the future without bringing any harm to his daughter. It was and is Chandola's lack of parenting skills that harms his daughter, not any malicious intent. However, the

majority singles out one restriction for reversal: the requirement that when Chandola spends time with his daughter, he must ensure that most of that time is spent without the presence of his parents so that he may gain necessary parenting skills. I see no basis for overturning that term of the parenting plan, which is reasonably calculated to prevent future harm to Chandola's daughter.

The majority claims that "[t]he trial court did not identify any particular harm in its ruling" that would justify the restriction, Majority at 26, but that is untrue. The trial judge clearly found that Chandola's daughter was being harmed by his parenting deficiencies, and created a parenting plan designed to give Chandola the opportunity and resources to develop needed parenting skills so that he would be able to spend time parenting his daughter in the future without harming her. The trial judge made a specific finding that Chandola needed to spend parenting time without his parents for the purpose of developing his parenting skills. CP at 84. Many of the other restrictions had the same goal, including the requirement that Chandola complete parent training.

The restrictions—including the requirement that Chandola spend parenting time without his parents—were designed to prevent immediate harm to Chandola's daughter resulting from his lack of parenting skills as well as harm over the long term. It is clear that the restrictions were specifically designed to improve Chandola's parenting skills to avoid harm to his daughter because the restrictions were set to be

implemented in stages, with Chandola scheduled to have increased time with his daughter after demonstrating compliance with the restrictions and presumably improving his parenting skills.

The majority acknowledges that parenting plan provisions need not be "narrowly tailored" to prevent harm, only "reasonably calculated" to prevent harm. Majority at 24. Here, each of the restrictions in the parenting plan was reasonably calculated to either prevent immediate harm or help Chandola develop the parenting skills he needs to prevent harm in the long term. The judge carefully explained that the requirement that Chandola spend time with his daughter practicing those parenting skills without his parents present was for that same purpose. Notably, this restriction is lifted after the first two stages of the parenting plan, presumably because those stages are designed to ensure that Chandola will gain those needed parenting skills. Thus, this restriction was temporary and tailored to fit the specific needs of the situation.

The majority would overturn the judge's conclusion based solely on its reading of the record. I disagree. The judge heard from the family members and the parenting experts and concluded that this temporary requirement, in combination with the other provisions of the parenting plan, would help Chandola develop those parenting skills he needs to be able to spend time with his daughter without harming her. The trial court's assessment of Chandola's problematic lack of parenting skills is supported in

the record and confirmed by the dramatic improvement in his daughter's behavior after the parents separated and the daughter began living with the mother. Since the separation, witnesses testified that the daughter "'is a changed child, more outgoing, interactive.'" CP at 93. The majority acknowledges that the child "made substantial emotional and social progress" after she began living primarily with her mother and that "the trial court clearly intended to ensure that [the daughter's] progress continue unhindered." Majority at 22. To ensure that progress continued, the trial court crafted a parenting plan reasonably calculated to improve Chandola's parenting skills, the ultimate issue causing harm to the daughter. It did not abuse its discretion in setting the terms of that parenting plan, so I would affirm.

## CONCLUSION

Every family law case is unique. Each family faces different challenges, and trial court judges are responsible for crafting orders and plans that take those challenges into account. Trial judges have wide discretion in those decisions, and we seldom upset them on appeal. This case is no different: the trial court judge oversaw an extensive trial, identified Chandola's parenting deficits as the primary cause for concern, and carefully designed a parenting plan to give Chandola the opportunity and resources to address those deficits while maintaining a relationship with his daughter. While some members of this court might have designed a different plan to achieve those goals, that is not our decision to make. We must be cautious of substituting our

judgment for that of the trial court judge. I agree with the Court of Appeals' holding that the parenting plan in this case was within the discretion of the trial court.

I respectfully dissent.

Owens, J.

Stephens, J.

Johnson

Madsen, C.J.