IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of:<br><br>the Parentage of E.Z.,<br><br>                  a minor child. | No. 82745-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DÍAZ, J. — Appellant, the mother, appeals a court's decision, following trial, to grant a petition to place her child permanently in Texas with respondent, the father.[1] The mother argues that the trial court improperly based its decision on what she argues was essentially a short-term medical emergency, and that the court improperly relied on the temporary parenting plan in forming its permanent parenting plan. Further, she argues the trial court erred in placing RCW 26.09.191 restrictions on her but not on the father. Finding no error of law and concluding that substantial evidence supports the court's decision, we affirm.

I.     BACKGROUND

The mother and the father are parents of a now six-year-old boy, E.Z., born in May 2017.[2] On March 22, 2019, the trial court issued a final parentage plan,

---

[1] To protect the privacy of E.Z., we refer to his mother as "the mother" and to his father as "the father."

[2] The mother originally believed another person was the father of E.Z., but a paternity test clarified that that person was not the father and the father's paternity was confirmed in February 2019.

ordering that the mother had custody of E.Z., and a child support order, ordering the father to pay child support to the mother. The court did not approve a parenting plan or residential schedule at that time because neither parent had requested one.

E.Z. lived with the mother in Washington State from his birth until Child Protective Services (CPS) intermittently placed him with the father in Texas, beginning in December 2019, because she experienced episodes of psychosis three or four times from November 2019 to July 2020, in the following ways.

In November 2019, the mother took E.Z. to a 13 Coins restaurant in the middle of the night. While there, the mother met a man she did not know, took E.Z. to his house, consumed alcohol and marijuana, and stayed the night there with the child. She then refused to leave and was arrested for trespassing the next morning ("13 Coins Episode"). She was admitted to Evergreen Hospital overnight on an involuntary commitment due to continued erratic behavior. CPS placed E.Z. in the temporary care of the mother's sister.

The 13 Coins Episode was the beginning of a manic episode that then lasted up through a second hospitalization on December 2, 2019, during which time she was disconnected from reality. On that date, the mother was admitted on an involuntary basis to Fairfax Behavioral Health for 36 hours, after police received several reports of child endangerment, involving allegations that the mother made

threats to kill her sister and herself ("Fairfax Episode"). As before, there was evidence of psychosis including paranoia and that her symptoms occurred in the context of cannabis use. E.Z. was placed in the temporary care of relatives. While she was in the hospital, the mother participated in a family meeting, after which it was agreed that E.Z. temporarily would reside with his father in Texas.

On January 17, 2020, the mother filed a motion for a parenting plan and residential schedule, which had been lacking, and an ex parte motion for the father to return E.Z. to her. On February 20, 2020, the court ordered the father to return E.Z. to the mother, because there was "no evidence of a court order placing" E.Z. with the father, and set up a visiting schedule. In March and April 2020, the parties continued litigating cross-motions for temporary and permanent parenting plans. In May 2020, the court ordered the mother to undergo a full mental health and substance abuse evaluation, where the evaluators would have all necessary records to inform their evaluation.

On June 23, 2020, the mother took E.Z. to an active protest zone, known as the Capitol Hill Autonomous Zone or CHAZ, where she was found nude at or about 4:00 a.m. after having smoked (perhaps involuntarily) a formaldehyde-soaked cigarette. Her behavior caused bystanders to be concerned about E.Z.'s safety and they took custody of him, despite her violent resistance ("CHAZ Episode"). The mother was detained by Seattle Police for indecent exposure and

involuntarily admitted to Swedish Medical First Hill overnight. CPS placed E.Z. in temporary foster care, but returned him the next day to the mother.

On or about July 13, 2020, the mother started calling law enforcement to make various "persecutory" and "irrational" claims about her family and about the father and posting aggressive social media messages. She would call police for assistance, they would show up, and she would act erratically and refuse to let them in the house. On July 18, 2020, the mother was arrested for assaulting her sister and detained involuntarily. She was admitted to NAVOS for nine days ("NAVOS Episode"). CPS again temporarily placed E.Z. with the mother's relatives.

On July 29, 2020, the father filed motions for a temporary family law order, a restraining order, and a parenting plan, asking the court to place E.Z. with him, place RCW 26.09.191 limitations on the mother, and make him the sole decision-maker of E.Z. The father represented that CPS informed him that, if he did not seek an order placing the child in his temporary custody, it would initiate a dependency action in order to protect the child from risk of imminent harm in his mother's custody if/when she is released.

In advance of the hearing on the motions, the Family Law CASA agreed with the father and recommended that he be the primary residential parent and sole decision-maker, and the mother's residential time with E.Z. be restricted, per

RCW 26.09.191, because of the mother's "history of mental health and substance abuse issues that place the child in potentially dangerous, high risk situations."

On August 13, 2020, the trial court issued a temporary parenting plan, which placed E.Z. in the custody and decision-making authority of the father and limiting the mother's time with E.Z., finding that the mother had neglected, abused or threatened to abuse E.Z. because of her behavioral health and substance abuse challenges. The court set for trial the motion for a permanent parenting plan for March 22, 2021.

In February 2021, the mother's forensic psychological evaluator, Dr. Michael Stanfill, submitted an updated report. He diagnosed the mother with bipolar disorder, severe with psychotic features, and found that her substance use was more intense than initially understood. At trial, he testified that it was difficult for him to say what the long-term prognosis was for the mother, but it was important to address those significant risks to help prevent the next episode. The mother further testified that, just before trial, the mother had followed the last of his recommendations and joined a bipolar support group, which met once or twice per week.

The Family Law CASA submitted an updated report, indicating the ongoing concern that, if E.Z. were placed back in the mother's care, she could relapse due to untreated triggers. At trial, the CASA reiterated those concerns and made the

same recommendations for the father to maintain custody. This recommendation included the CASA's finding that there was no record that the father had domestic violence charges filed against him, despite the mother's claim that he raped her. Indeed, the Bellevue Police Department investigated the rape allegations, but no charges were pursued against the father.

Following a five-day trial, the trial court orally ruled, on April 1, 2021, that the father would be the permanent primary residential parent and the sole decision-maker over E.Z. The court held that since the parentage order was entered on March 22, 2019, there was a substantial change in the mother's situation, and the court concluded that the mother's conduct adversely affected E.Z.'s best interests, and constituted substantial nonperformance of parenting functions.

In placing restrictions on the mother's parenting time, the court specifically recounted the 13 Coins Episode and the CHAZ Episode as the basis for its finding of neglect. Furthermore, the court found that the mother has a long-term emotional impairment which presently interferes with her ability to parent, crediting the Family Law CASA and Dr. Stanfill's conclusion that the mother suffers from bipolar disorder, which, if not managed properly, could continue to impact her parenting. The court also found that the mother has a "heavy" substance abuse problem, which interferes with her ability to exercise appropriate judgment regarding the child's welfare, again crediting the Family Law CASA and Dr. Stanfill.

The court entered its orders, findings, and parenting plan on April 16, 2021. The mother timely filed a motion for reconsideration, which the court denied. The mother now appeals both rulings. The father filed no brief in opposition.

## II.    ANALYSIS

The mother challenges each of the seven substantive decisions the trial court made in its final parenting plan. However, she does not present substantive argument on each. Instead, the mother argues fully only three to four of the seven assignments of error.[3] Specifically, she claims that the trial court improperly based its decision on, what she argues was, a short-term medical emergency, and that the court improperly relied on the temporary parenting plan in forming its permanent parenting plan. Further, she argues the trial court erred in placing RCW 26.09.191 restrictions on her but not on the father. We will address each in turn.

## A.    Standards of review and Applicable Law

Washington "recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and that the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests." RCW 26.09.002.

---

[3] Passing treatment of an issue or lack of reasoned argument are insufficient to merit judicial consideration. Joy v. Dep't of Labor & Indus.,170 Wn. App. 614, 629, 285 P.3d 187 (2012). Accordingly, we will consider only the arguments enumerated here.

The construction of a statute is a matter of law, and the construction given a statute by a trial court is reviewed de novo. In re Marriage of Hansen, 81 Wn. App. 494, 498, 914 P.2d 799 (1996). While conclusions of law are reviewed de novo, findings of fact are reviewed for substantial evidence. In re Marriage of Zier, 136 Wn. App. 40, 45, 147 P.3d 624 (2006). "Substantial evidence" is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted. In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012).

"A trial court wields broad discretion when fashioning a permanent parenting plan." Id. On appeal, this court reviews a parenting plan for abuse of discretion, which "occurs when a decision is manifestly unreasonable or based on untenable grounds or untenable reasons." Id. The trial court's findings of fact are treated as verities on appeal, so long as they are supported by substantial evidence. Id.

The Parenting Act requires that "the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities." RCW 26.09.002 (enumerating factors).

B. Finding of Long-Term Impairment

The mother argues that the trial court erred in "focus[ing] on [the mother]'s mental health diagnosis," which she characterizes as a short-term medical emergency, and she argues cannot be a basis for a custodial parent to lose legal custody. She analogizes her challenges to those in In re Marriage of Thompson,

32 Wn. App. 418, 647 P.2d 1049 (1982) and In re Marriage of Taddeo-Smith, 127 Wn. App. 400, 110 P.3d 1192 (2005).

In both cases, the mother-appellant had temporarily placed the child with the respondent father. Thompson, 32 Wn. App. at 419; Taddeo-Smith, 127 Wn. App. at 402. In Taddeo-Smith, the mother suffered a physical injury in a car accident, and asked the father "to look after the children temporarily, while she was hospitalized." 127 Wn. App. at 405-06. In both cases, neither party "consented" to a permanent placement. Thompson, 32 Wn. App. at 420 (defining consent as the "voluntary acquiescence to surrender of legal custody"); Taddeo-Smith, 127 Wn. App. at 406-07. The mother argues that, without consent to permanent placement, a short-term medical emergency cannot justify the court's decisions.

The crux of the matter here is whether, under the substantial evidence standard, the trial court's conclusion that the mother suffers from a "long-term impairment" is sufficiently founded. Zier, 136 Wn. App. at 45. If the conclusion is sufficiently founded, then this matter is facially distinguishable from both Thompson and Taddeo-Smith.

It is an unchallenged verity that both the Family Law CASA and Dr. Stanfill concluded that the mother suffers from severe bipolar disorder with psychotic features, which is a long-term emotional impairment, and which has, and if not managed properly would continue to, impact her parenting. Dr. Stanfill also

concluded, and the court also found, that the mother has a "heavy" substance abuse problem, which has and could continue to interfere with her ability to exercise appropriate judgment regarding E.Z.'s welfare. Additionally, it is important to highlight that the mother just had started attending a bipolar support group very shortly before trial.

The mother argues that the court "relied on incidents that had occurred nearly ten months prior [to trial], within a discrete period of eight months." In other words, the mother argues that the court did not focus on the evidence she wished it had. But, on the standard of review applicable here, that is not the inquiry. The inquiry is whether at the time of the court's orders there was sufficient evidence "to persuade a fair-minded person of the truth of the matter asserted." Katare, 175 Wn.2d at 35. On the basis of the clear diagnosis, resulting behaviors, and uncertain prognosis, that standard has been met here, even if it may be the case that, with proper and on-going treatment, which had started shortly before trial, the mother may be able to manage both of her disorders in the future.

Finally, we need not reach whether the mother consented to a permanent change in custody. Ultimately it was in the court's "broad discretion" to fashion a parenting plan seeking to achieve "finality," to avoid "ping-pong" litigation over custody, and to maximize "the stability of a child's environment." Katare, 175

Wn.2d at 35; Thompson, 32 Wn. App. at 422. Stability appropriately was the court's focus.

C.    Reliance on Temporary Parenting Plan

The mother next asserts that the trial court overly relied on the temporary parenting plan, which "overshadowed" the best interests of E.Z.[4]

Indeed, RCW 26.09.060(10)(a) provides that a temporary order "[d]oes not prejudice the rights of a party or any child which are to be adjudicated at subsequent hearings in the proceedings." And, RCW 26.09.191(5) provides that "[i]n entering a permanent parenting plan, the court shall not draw any presumptions from the provisions of the temporary parenting." Finally, "our legislature has expressed a preference that permanent orders rest on evidence presented at trial unprejudiced by temporary orders." In re Marriage of Abbess, 23 Wn. App. 2d 479, 488, 516 P.3d 443 (2022). "This is because temporary orders serve a different purpose than permanent orders and are issued based on different criteria and evidentiary standards." Id.

---

[4] The mother mentions in passing that the court "premised its designation of the father as primary residential parent based on the temporary parenting plan" and, as such, compels this court to review this particular issue de novo. The mother does not cite to any authority for that statement. Where a party fails to provide citation to support a legal argument, we assume counsel, like the court, has found none. State v. Loos, 14 Wn. App. 2d 748, 758, 473 P.3d 1229 (2020) (citing State v. Arredondo, 188 Wn.2d 244, 262, 394 P.3d 348 (2017)).

In Abbess, the trial court "us[ed] stale and discredited evidence from a negotiated temporary order that both parties planned to contest at trial and ultimately deprived [the father] of a meaningful opportunity to litigate equal residential time." Id.

The mother argues that the trial court's following two statements demonstrate the same overreliance on the temporary plan: (1) "Given that the child has resided primarily with [the father] [. . .] [the father] has necessarily taken greater responsibility for performing parenting functions for the daily needs of the child."[5] And (2) "what I'm doing is changing the parentage order, which was the only thing that previously reflected that the child would live primarily with [the mother]. In fact, the child has not lived primarily with [the mother] for some time."

The mother takes both statements out of context and the statements, in fact, do not reference the temporary parenting plan. On the contrary, the trial court prefaced these statements by finding that "returning the child primarily to [the mother]'s care would be harmful to the child's physical, mental or emotional health, and *it would be better for the child* to change the final parentage order to provide the child reside primarily with [the father]." (Emphasis added). In other words, the

---

[5] We accept how the mother chose to paraphrase the court's remarks, although it is telling that the full statement emphasizes the mother's "neglect" and the "bonding" that occurred between the father and E.Z. as a result.

trial court was clear it was applying the "best interest of the child standard," required by RCW 26.09.002.

Moreover, the statement that the child primarily resided with the father and not the mother was a mere uncontested factual observation. And, indeed, such a factual observation is an appropriate factor in the fashioning of a permanent residential schedule. RCW 26.09.187(3)(a) (iii) ("the court shall consider . . . whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child"); Thompson, 32 Wn. App. at 421 ("'While time spent with each parent is not determinative, it is a factor.'") (quoting In re Marriage of Timmons, 94 Wn.2d 594, 601, 617 P.2d 1032 (1980)).

In short, we can locate nothing in the record that provided the father with an "unfair advantage when the permanent parenting plan was entered" because of the previously entered temporary plan. In re Marriage of Kovacs, 121 Wn.2d 795, 808, 854 P.2d 629 (1993). In turn, there was no error.

D.      RCW 26.09.191 Restrictions

Finally, the mother argues that the trial court erred in placing RCW 26.09.191 restrictions on her but not on the father.

RCW 26.09.191 bars a trial court from precluding or limiting any provision of the parenting plan "unless the evidence shows that '[a] parent's . . . conduct may have an adverse effect on the child's best interest.'" In re Marriage of Chandola,

180 Wn.2d 632, 642, 327 P.3d 644 (2014) (quoting RCW 26.09.191(3)) (alteration in original). "[E]vidence of actual damage is not required" before imposing restrictions under RCW 26.09.191(3), and a court may impose restrictions where substantial evidence shows "that a danger of . . . damage exists." In re Marriage of Burrill, 113 Wn. App. 863, 872, 56 P.3d 993 (2002)) (analyzing RCW 26.09.191(3)(e)).

The mother first claims that there was "no evidence" proffered that E.Z. actually "experienced physical, mental, or emotional harm or that the danger of damage currently continues to exist."[6]

This is a significant overstatement. As testified to by the Family Law CASA, CPS placed E.Z. temporarily with at least four different family members or friends between November 2019 and July 2020, and E.Z. underwent a short stint at temporary foster care. The CASA further recommended that the mother's residential time with E.Z. should be restricted per RCW 26.09.191, because of the

---

[6] The mother mentions in passing that the court's decision to place ".191 restrictions upon the mother for her disability based on its interpretation of the statute" compels this court to review this particular issue de novo. The mother does not explain how the trial court "premised" that decision on an interpretation of RCW 26.09.191. Neither the oral nor the written ruling delineated any interpretation of RCW 26.09.191(3) which the mother argues is error. The court is not required to search the record to locate the portions relevant to a litigant's arguments. Cowiche Canyon Conservancy v. Bosley,118 Wn.2d 801, 819, 828 P.2d 549 (1992). Thus, we will not consider this issue on that standard of review.

mother's "history of mental health and substance abuse issues that place the child in potentially dangerous, high risk situations."

Without repeating all the facts reviewed above, these "high risk situations" included being in the apartment of a strange man while his caretaker (the mother) was drugged and belligerent (the 13 Coins Episode) and the CHAZ Episode, where bystanders were so concerned about E.Z.'s safety that they tried to take him away from the mother.

When we combine this evidence with the substantial evidence that the mother suffers from "long-term impairment," we conclude a fair-minded person can be persuaded that returning E.Z. primarily to the mother's care, at a minimum, "*may* have an adverse effect on the child's best interests." RCW 26.09.191(3) (emphasis added).

Additionally, the mother argues that the court should have applied RCW 26.09.191 against the father because he engaged in "domestic violence" and in the "abusive use of conflict."

As to the former allegations, the mother again points to evidence that she wishes the trial court had credited more fully. Again, that is not the standard. The inquiry is whether at the time of the court's orders there was sufficient evidence "to persuade a fair-minded person of the truth of the matter asserted." Katare, 175 Wn.2d at 35. Here, the CASA testified that a search of the relevant databases

revealed that, while the mother had accused the father of rape, there was no record of any law enforcement agency charging the father with rape, even after conducting some investigation. There was no court or any tribunal that substantiated that allegation. Finally, there was testimony that the rape allegation occurred only after E.Z. was placed with his father, as a means to ensure his return. Based on this standard of review, the trial court had ample evidence to not impose restrictions against the father for domestic violence.

As to the latter allegations, the mother also accused the father of both demeaning her and "weaponizing" her mental health issues during the trial. She claims that the trial court "completely ignored any evidence in support of [the father] engaging in such conflict." Tellingly, the mother provides no case law to support her claims that a party's statements made during trial could constitute an abusive use of conflict. Where a party fails to provide citation to support a legal argument, we assume counsel, like the court, has found none. State v. Loos, 14 Wn. App. 2d 748, 758, 473 P.3d 1229 (2020) (citing State v. Arredondo, 188 Wn.2d 244, 262, 394 P.3d 348 (2017)).

Having reached only those assignments of error fully argued, we need not reach the subsequent issues that depend on them (an order to pay child support and her attorney fees), or those that were insufficiently argued.

## III.  CONCLUSION

For the foregoing reasons, we affirm the trial court's final parenting plan and denial of the mother's motion for reconsideration.

_Díaz, J._

WE CONCUR:

_Feldman, J._                    _Dwyer, J._