# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of | No. 51551-2-II |
| DANIEL SPERRY, | |
| Appellant, | |
| and | |
| LIBERTY SPERRY, | UNPUBLISHED OPINION |
| Respondent. | |

SUTTON, J. — Daniel Sperry appeals the trial court's orders granting modification of the parenting plan and denying reconsideration. He argues that the trial court's findings of fact regarding the new parenting plan and the restrictions on his visitation are not supported by substantial evidence and the findings do not support the court's conclusions of law regarding modification. He requests that we reverse the trial court's order and remand for a new trial, entry of new findings, and entry of a new parenting plan that does not restrict his residential time with his minor child, RS.[1] Liberty Sperry (n/k/a Liberty Weaver) requests that we affirm and requests an award of reasonable attorney fees and costs. We affirm the trial court's orders and award Liberty[2] reasonable appellate attorney fees and costs.

---

[1] We use the minor's initials to protect their privacy.

[2] Daniel and Liberty Sperry are referred to by their first names for clarity. No disrespect is intended.

FACTS

I. BACKGROUND FACTS

Daniel and Liberty began a relationship in 2010 and married in June 2015. They had one child, RS, born in 2013. In September 2015, they filed for dissolution. In January 2016, the trial court entered agreed orders for dissolution, along with a parenting plan, residential schedule, and child support.

Paragraph 3.1 of the residential schedule portion of the 2016 final parenting plan states,

The parents shall alternate custody of the child every month, with the receiving parent assuming the cost of the transportation and responsibility for being present during the travel. Such exchanges and timing shall be by agreement of the parties. The mother shall have an extended period of custody in the summer time lasting no more than 3 consecutive months. Within 24 months of the date of this document, the father intends to relocate to California wherein this plan will continue. Custody during important holidays shall be alternated on a yearly basis by agreement of the parties.

Clerk's Papers (CP) at 28.

Paragraph 3.12 listed Daniel as the designated custodian as follows:

The children named in this parenting plan are scheduled to reside the majority of time with [Daniel]. This parent is designated the custodian of the child(ren) solely for the purposes of all other state and federal statutes which require a designation or determination of custody. This designation shall not affect either parent's rights and responsibilities under this parenting plan.

CP at 30. The child support order also named Daniel as the custodial parent.

In 2016, Daniel and Liberty both filed petitions to modify the parenting plan and residential schedule alleging a substantial change in circumstances had occurred under RCW 26.09.260(1). Liberty also alleged that RS's current living situation was harmful and requested that Daniel's residential time be restricted under RCW 26.09.260(4) and former RCW 26.09.191 (2011).

2

## II. TRIAL

The trial court conducted a two-day bench trial and focused on RS's current living environment with Daniel and whether restrictions on Daniel's residential time were warranted.

A. DANIEL'S SEXUAL THOUGHTS AND DOMESTIC VIOLENCE INCIDENT

1. Daniel's Sexual Thoughts of RS

Liberty testified that she first became concerned about Daniel in the spring of 2014 when he told her that he was having sexual thoughts while bathing RS. She reported the matter to Child Protective Services (CPS) who conducted an investigation and concluded that there was no abuse. Liberty also testified that a second report was made in 2016 in California after Daniel returned RS from a road trip and she became concerned about RS's cleanliness and irritation of RS's anus. CPS conducted an investigation and concluded that there was no abuse.

> During his testimony, Daniel admitted that he had sexual thoughts about RS:
>
> This was something that was never an issue until now we've got a divorce going on. So yeah, I have an initial fear of even admitting that these conversations happened because they were private conversations between my wife and I at the time.
>
> . . . .
>
> . . . Based on the fact that I was always bathing [RS] and I had a wife who was telling me I couldn't even watch an R-rated movie without checking IMDb parental controls.
>
> . . . .
>
> . . . I'm saying, when I made these comments, there were things in our relationship that made it appropriate for the situation to happen. But it -- she's trying to paint it in a light that's just disgusting.
>
> . . . .
>
> . . . I'm not going to completely dismiss my responsibility to my own person.
>
> . . . .

. . . But yeah. I was in a relationship that was definitely causing me to think overly sexually. And being the one who is always bathing my daughter, I didn't like the fact that I was in a time where I'm bathing my daughter and thinking sexually at the same time. . . .

. . . .

. . . I'm saying, it's not good to let unhealthy thoughts just spin off or to think too hard on them on your own. That's why I figured communicating with my wife about it would be the best option.

. . . .

. . . At the time I was asking her to bathe [RS] more, please, [be]cause I didn't want to be thinking sexually while bathing [RS].

. . . .

. . . Okay, so now you want to know about the exact conversation that happened?

. . . .

. . . So like I said I was always bathing [RS]. We were at a time where I wasn't getting a lot of sex and I was being told that I couldn't really think sexually in general. So I was trying to do my best to actually stop looking at other girls while walking down the street, et cetera, et cetera. So sex was definitely something that I wanted at the end of the night more often.

. . . .

. . . And I was bathing [RS] one night. I had a thought about having sex while I was bathing [RS]. I didn't like that she is aware of her privates now at her age and I'm having these thoughts. I just thought it was a very weird thing. Why am I always bathing her? Maybe you should bathe her, and then we could get down to our husband and wifely duties afterwards. It had nothing to do with [RS]. She was just there.

. . . .

. . . I'm saying [Liberty's] partially the reason that I had a lot of sexual tension.

Verbatim Report of Proceedings (VRP) (Apr. 18, 2017) at 143-47.

In his related text messages to Liberty, Daniel stated,

[I]t should have been said, because that's what people do, talk about shit so that it doesn't fester inside them. I talked to you about something that was confusing and bothering me and told you [that] you had nothing to worry about. I'm not going in circles with you. Everything will be handled by CPS and in court. [N]o need to talk to each other.

4

Ex. 2. Later in the same text message chain, he stated, "I'm admitting to it because being dishonest is the worst thing [I] can do right now. I paid money for that advice. [S]o I'm being honest because [I] did nothing wrong." Ex. 3.

Luce Weaver, Liberty's grandmother, testified that she observed RS exhibiting alarming sexual behavior. She testified that while bathing RS, the following exchange occurred:

> I gave her the bar of soap and I said, "You need to clean yourself." She got the bar of soap and put it in her -- what she calls her private area and started moving it up and down. And I said, "What are you doing?" And she said, "I like this." I said, "Who taught you that?" She said -- she whispered, "Daddy, because he loves me." And she shut down completely after that.

VRP (Apr. 18, 2017) at 172-73.

Weaver further testified that she witnessed additional instances of RS demonstrating concerning sexual behavior. She stated,

> [RS] would get stuffed animals and she would hump them. And I -- one occasion it was a bunny. And she didn't want to talk. So I had the bunny talk. And I had the bunny talk to her and ask her why she did that. And she said, "Because he likes the way I smell." And the bunny asked her, "Who taught you that?" [She responded,] "My daddy." And then she just completely shuts down.

VRP (Apr. 18, 2017) at 173. Weaver testified that these were examples of incidents that had happened multiple times.

2. Domestic Violence Incident

Liberty testified that in 2015 while in Pacific County, Daniel was driving her home late at night on a dark road and they were arguing over the parenting plan. She testified that he asked her to get out of the car. He called the police and told them he was going to strike her if law enforcement did not respond to his call.

B. WITHHOLDING

Liberty also testified that Daniel kept RS from her during June, July, and half of August in 2016. Daniel and Liberty had agreed to exchange RS at the airport in Denver, Colorado, on July 30, 2016. Liberty purchased plane tickets for herself and RS after Daniel agreed to bring RS to that airport for the exchange. About a week prior to the agreed exchange date, Liberty confirmed the plan with Daniel. At this point, Daniel told Liberty that he would not be bringing RS to the airport in Denver because he and RS were in California. Daniel specifically denied Liberty access to RS on July 27, 2016, when it was her turn for visitation, and she came to his residence with the assistance of a police officer to retrieve RS.

Daniel testified that he did not withhold RS in the summer of 2016 because August was his regularly scheduled visitation, and Liberty was not able to have her visitation with RS in July so he was merely following the agreed parenting plan and did not think he needed to adjust the schedule to accommodate Liberty at that time. He also said that at times, Liberty lacked the money to provide the transportation for visitation with RS and he gave her money and purchased her airfare. He denied that he ever refused her visitation with RS when she had bought tickets and had the money to provide transportation for the visitation.

C. GUARDIAN AD LITEM INVESTIGATION AND REPORT

Nancy McAllister, the guardian ad litem (GAL), testified that RS should be placed with Daniel. She testified that the original parenting plan designated Daniel as RS's custodial parent and he should remain the custodial parent. She also testified that she was paid $800 for her work, spent most of her time in a deposition, did not contact any of Liberty's witnesses due to the lack

of additional payment or approval for additional investigation, and the parties did not request further investigation.

McAllister was concerned that Liberty had moved around a lot, RS spent most of her time with Daniel prior to the first CPS allegation, and RS returned to live with Daniel despite Liberty's concerns related to Daniel. Liberty had not secured stable housing in California but had been residing with her grandparents. The GAL watched a YouTube video in which Liberty indicated that she had contact with RS via Skype and did not appear concerned about RS continuing to reside with Daniel. She testified that she observed Daniel and RS on a Skype call, but that "it was not facilitated by the other people [on] the other end of the line." VRP (Apr. 18, 2017) at 39.

### III. TRIAL COURT'S DECISION AND ORDER

The parties agreed, and the trial court found, that a substantial change in circumstances had occurred and thus, a modification was warranted.

### A. MODIFICATION

### 1. Change in Circumstances

The court ruled that

> [t]here has been a substantial change in circumstance justifying a modification, if only because of the move by the Respondent to California, and the failure of the Petitioner to move as contemplated by the parties at the time they entered into the parenting plan. Furthermore there is an episode of domestic violence perpetrated against the Respondent by the Petitioner, and a troubling sexual episode involving the Petitioner and [RS] which has not been addressed professionally. The Court further finds that the best interests of the child are served by modification and the present environment is harmful to the well-being of the child. Finally the Court finds that the harm caused by the changes outweighed by the advantage of the change. The Court requires [RS] to live a majority [of] the time with the Respondent which is consistent with the current parenting plan and least disruptive. The fact that the Petitioner did not follow the parenting plan by allowing the Respondent her summer visitation does not change that aspect,

because he cannot profit by his failure to follow Court orders. The Respondent has assets and family in California who can assist with the childcare requirements of a child [RS's] age.

CP at 68.

2. RS's Living Environment with Daniel

The trial court found that "[RS's] current living situation is harmful to [her] physical, mental, or emotional health." CP at 93. The court also found that "[t]he distances involved between the parties makes the current parenting plan unworkable, as does the inability [of] the parties to work together in any meaningful way." CP at 64. The court ruled that

the present environment is detrimental [to the] child's physical[,] mental[,] or emotional harm, and the harm likely caused by a change of environment is outweighed by the advantage of the change to the child. Furthermore, once [RS] starts school, the current parenting plan is unworkable in the context of the child's schooling. If the Court did not change the current parenting plan, it would have to do so at the time school begins. This would be more disruptive than if the issue is addressed at this time.

CP at 65.

The court rejected the GAL's report and entered the following relevant findings:

[The] Court rejects the report of the Guardian Ad Litem as incomplete and not consistent with the facts as the Court finds them. The Guardian Ad Litem did not contact the mother's witnesses because she spent most of her time at a deposition. There is no showing that the Court would not have required the parties to pay additional money for a complete Guardian Ad Litem's report, nor any indications the Court itself would have not paid for such work. The fact of the matter remains that the child is entitled to a complete investigation which was not done.

CP at 65. The court also rejected the GAL's statement that

the father is more likely [to] encourage a relationship with the mother than the mother is to encourage a relationship with the father. This apparently was . . . based upon her observations of a Skype conversation between the father and the child at which the mother was thought not to be helpful. The Court finds that this contact with the father occurred in the presence of the maternal grandmother and the mother

was not present.  Indeed [it] is the Court's opinion that the father is less likely to encourage a relationship between the mother and child considering his conduct related to travel to and from Denver and his failure to allow visitation with the child when he was in Southern California.

CP at 65.

3.  Daniel's Sexual Thoughts About RS

As to Daniel's sexual thoughts about RS, the trial court stated,

The Court is also troubled by the sexual context related to the bathing of [RS] by the Petitioner.  The Court is concerned that the Respondent left the child in the care of the Petitioner despite Respondent's concern about this episode.  While it is true she reported the matter to CPS, it is also true she did not believe there was nothing to it.  Some degree of specificity is needed to understand this issue.

CP at 66.

The court further found that

Respondent testified that the Petitioner told her that he sometimes has thoughts of inappropriately touching [RS], but that he would never act upon those thoughts.  He assured her he would not act upon his thoughts.  In his texts [sic] message related to this issue he states: "[i]t should have been said, because that's what people do, talk about shit so that it doesn't fester inside them.  I talked to you about something that was confusing and bothering me and told you [that] you had nothing to worry about.  I'm not going in circles with you.  Everything will be handled by CPS and in court.  [n]o need to talk to each other[.]"  Later in the same text string he texted, "I'm admitting to it because being dishonest is the worst thing [i] can do right now.  [i] paid money for that advice.  So I'm being honest because [i] did nothing wrong."

Respondent's [grand]mother testified that she observed [RS] engage in sexually suggestive behavior on a repeated basis after the conversations regarding inappropriate thoughts by the Petitioner.  The Court accepts this testimony.  Moreover further reading of the Petitioner's texts reveals an uncommon concern for participating in the investigation by CPS in California initiated by the Respondent.  It is unclear to the Court why he should worry that his daughter was in danger when the investigation related to his conduct, that he should be present during any interview and that she couldn't have an evaluation unless he gave permission.

CP at 67-68 (some alterations in original).

9

B.  WITHHOLDING

The trial court found, after Liberty attempted a number of exchanges during the summer of 2016, that "DANIEL SPERRY has kept [Liberty] away from [RS] for a long time, without good reason."  CP at 70.  The court also found that "[t]he mother has moved far too many times for the best interest of the child.  The father has withheld the child and failed to follow the parenting plan."  CP at 66.

C.  RESTRICTIONS

The trial court found that Daniel's residential time should be restricted under former RCW 26.09.191(3)(f) because he had kept RS away from Liberty for a long time without good reason.  The trial court found that "[t]o protect the child, the court will limit the parenting time and participation of Daniel Sperry," specifically referring to his summer visitation.  CP at 93.  The court ordered Daniel to obtain a psychological evaluation and submit a report.  The court restricted summer visitation until the evaluation and report were completed and stated that this restriction was subject to modification.  The court also ordered that Liberty obtain an evaluation of RS.

Regarding the restriction, the court stated in relevant part:

The Petitioner shall be required to obtain an evaluation with a qualified psychiatrist or psychologist who has complete information regarding the Petitioner's admissions as outlined herein.  No summer visitation shall occur until such evaluation has been received by the Court and the Respondent.  The Respondent shall obtain an evaluation of the child, and the cost of said evaluation shall be borne equally by the parties and shall occur within six weeks of the entry [of] final paperwork in this matter.  The Court reserves the right to modify this modification based on the outcome of these evaluations.

CP at 68.

The trial court also ordered that Daniel's visitation take place every other weekend within 25 miles of Liberty's residence. The court stated in relevant part that

Petitioner should be entitled to visitation every other weekend so long as visitation occurs within 25 miles of the Respondent['s] residence. In addition . . ., the Respondent should be entitled to six weeks of an interrupted visitation during the summer months. All holidays are awarded to the Respondent.

CP at 68.

## D. RESIDENTIAL PLACEMENT

Regarding the residential placement of RS, the trial court found that

[t]he mother, however, has testified regarding her relationship with the child and her performance of parenting functions. The Court finds this testimony believable and accepts the theory that in the early stages of a breakup and reestablishing a productive life there is much turmoil and changes. Throughout this process the Respondent has sought to minimize the impact on her child, although the Court does not excuse the absence of her from the child's life for some three-month period. While part of that period of time has to do with the father's failure to follow the parenting plan, it is also true [that] the mother did not do enough to stay in contact with her daughter.

CP at 66. The trial court found that "[i]t is clear that the parent entitled to a majority of the time with the child was the mother." CP at 64. The trial court ordered that RS be placed with Liberty as the primary custodial parent.

The trial court, after finding under former RCW 26.09.191(3)(f) that Daniel withheld RS from Liberty without good cause, entered a new parenting plan and residential schedule which designated Liberty as the primary residential parent with holidays and spring breaks, allowed Daniel regular every other weekend visitation within 25 miles of Liberty's residence, and limited Daniel's summer visitation. The court filed a written memorandum decision, entered written findings of fact and conclusions of law, and incorporated by reference the memorandum decision

into its final orders. After entry of the final orders, Daniel moved to reconsider and filed additional evidence which Liberty objected to, and the court denied his motion. Daniel appeals the court's orders.

## ANALYSIS

### I. LEGAL PRINCIPLES

A trial court may modify a parenting plan when it finds that "a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child." RCW 26.09.260(1). A court must retain the existing residential schedule unless, among other factors, "[t]he child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child." RCW 26.09.260(2)(c). Here, the parties and the trial court agreed that because a substantial change in circumstances had occurred, modification of the agreed parenting plan was required.

The best interests of the child is the standard for determining parental responsibilities. *In re Marriage of Katare*, 175 Wn.2d 23, 36, 283 P.3d 546 (2012). In crafting the residential provisions of a parenting plan under RCW 26.09.187(3), the trial court must consider the relationship of the child with each parent and the parents' performance of parenting functions. "There is some overlap between the trial court's authority under RCW 26.09.187, to establish the terms of the parenting plan, and its authority under [former] RCW 26.09.191(3), to 'preclude or limit any provisions of the parenting plan.'" *In re Marriage of Chandola*, 180 Wn.2d 632, 644, 327 P.3d 644 (2014) (quoting former RCW 26.09.191(3)).

RCW 26.09.260(4) provides, "The court may reduce or restrict contact between the child and the parent with whom the child does not reside a majority of the time if it finds that the reduction or restriction would serve and protect the best interests of the child using the criteria in [former] RCW 26.09.191." Further, "a court can substantially restrict a parent's contact with his or her child simply by establishing a residential schedule pursuant to its discretion under RCW 26.09.187." *Chandola*, 180 Wn.2d at 644. Relevant here, former RCW 26.09.191(3)(f) permits the court to "preclude or limit any provisions of the parenting plan" if "[a] parent has withheld from the other parent access to the child for a protracted period without good cause."

A trial court has broad discretion in developing a parenting plan. *Katare*, 175 Wn.2d at 35. We review a trial court's parenting plan for an abuse of discretion. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; . . . it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997). A trial court abuses its discretion if it imposes a restriction under former RCW 26.09.191 that is not reasonably calculated to prevent physical, mental, or emotional harm to the child. *Chandola*, 180 Wn.2d at 655.

We review a trial court's findings of fact to determine if they are supported by substantial evidence. *Black*, 188 Wn.2d at 127. Substantial evidence is that which is "'sufficient to persuade a fair-minded person of the truth of the matter asserted.'" *Black*, 188 Wn.2d at 127 (quoting *Katare*, 175 Wn.2d at 35). We do not review the trial court's credibility determinations or weigh evidence even if we may disagree with the trial court. *Black*, 188 Wn.2d at 127. We are extremely

reluctant to disturb child placement decisions "[b]ecause the trial court hears evidence firsthand and has a unique opportunity to observe the witnesses." *In re Parenting & Support of C.T.*, 193 Wn. App. 427, 442, 378 P.3d 183 (2016).

## II. MODIFICATION ORDER

Daniel argues that the court's restrictions on his visitation and the other residential provisions he challenges are not supported by substantial evidence. We hold that the court's findings are supported by substantial evidence and the findings support the restrictions imposed by the court's conclusions of law in the modification order.

### A. RESTRICTIONS BASED ON WITHHOLDING

#### 1. Withholding RS

Daniel argues that the trial court's finding that he kept Liberty away from RS "'for a long time, without good reason'" is not supported by substantial evidence and the finding does not support the court's restrictions on his visitation. Br. of Appellant at 2, 29. We disagree and hold that substantial evidence supports the finding and it supports the court's conclusions of law that restrictions under former RCW 26.09.191(3)(f) were appropriate.

Daniel and Liberty had agreed to exchange RS at the airport in Denver on July 30, 2016. Liberty purchased plane tickets for herself and RS after Daniel agreed to bring RS to that airport for the exchange. About a week prior to the agreed exchange date, Liberty confirmed the plan with Daniel. At this point, Daniel told Liberty that he would not be bringing RS to the airport in Denver because he and RS were in California.

Liberty went to retrieve RS from Daniel on their agreed exchange date and Daniel denied her access to RS. Daniel kept RS with him for June, July, and half of August in 2016. Daniel

specifically denied Liberty access to RS on July 27, 2016, when it was her turn for visitation, and she came to his residence with the assistance of a police officer to retrieve RS.

Daniel argues that he had good reason for the withholding, he believed that he was following the parenting plan, August was his regular visitation month, and Liberty was unable to visit RS in July. Thus, he contends that the court erred in finding that he withheld RS without good cause. But the trial court did not find his explanation credible and found Liberty's explanation to be credible. We do not reweigh the trial court's credibility determinations. *Black*, 188 Wn.2d at 127. The trial court's finding that he withheld RS for a period of time without good cause under former RCW 26.09.191(3)(f) is supported by substantial evidence. Based on this finding, the court properly restricted Daniel's residential time.

2. 25-Mile Restriction

Daniel also argues that the court restricted his visitation to every other weekend within 25 miles of Liberty's residence and half the summer with no holidays or spring breaks and ordered that he complete an evaluation, which provisions he claims are not reasonably related to the finding that he withheld RS, citing *Chandola*, 180 Wn.2d at 640, 644. We disagree.

We first address what restrictions the trial court ordered and under what statutory authority. After finding that Daniel withheld RS without good cause under former RCW 26.09.191(3)(f), the court stated that "[i]ndeed [it] is the Court's opinion that the father is less likely to encourage a relationship between the mother and child considering his conduct related to travel to and from Denver and his failure to allow visitation with the child when he was in [California]." CP at 65. The trial court then ordered that his *summer visitation* be restricted until he completed an evaluation and submitted a report. Contrary to Daniel's claim initially, the court *did not restrict*

his regular visitation, but granted him every other weekend visitation which is a standard residential provision. His visitation includes holidays and spring breaks which fall on his weekend visitation; he is not restricted in this regard. However, the record is unclear whether the provision that he visit within 25 miles of Liberty's residence was intended to be imposed as a restriction under former RCW 26.09.191(3)(f) or under the court's broad authority under RCW 26.09.187(3).

Under former RCW 26.09.191(3), a trial court can "preclude or limit any provisions of the parenting plan." "Practically speaking, a court can substantially restrict a parent's contact with his or her child simply by establishing a residential schedule pursuant to its discretion under RCW 26.09.187." *Chandola*, 180 Wn.2d at 644. However, former RCW 26.09.191 restrictions are "fundamentally different from the provisions necessary to every parenting plan under RCW 26.09.187." *Chandola*, 180 Wn.2d at 644. "Restrictions on a parent's geographic location, for example, are not authorized as typical parenting plan provisions under RCW 26.09.187." *Chandola*, 180 Wn.2d at 644-45 (citing *Littlefield*, 133 Wn.2d at 54-55; LAWS OF 2000, ch. 21). Instead, they are imposed under former RCW 26.09.191(3). *Chandola,* 180 Wn.2d at 645. "Similarly, restrictions on a parent's travel or conduct can be imposed only under [former] RCW 26.09.191—not as features of the parenting plan under RCW 26.09.187." *Chandola*, 180 Wn.2d at 645.

The trial court, after finding that Daniel withheld RS without good cause, had the authority under former RCW 26.09.191(3)(f) to impose the restrictions that it did—ordering a psychological evaluation and report, conditioning summer visitation upon the completion of that evaluation and report, and requiring visits to occur within 25 miles of Liberty's residence. The court specifically ordered that these provisions were subject to modification after the evaluation and report. Based

on this record, we cannot conclude that the court's restrictions were untenable or manifestly unreasonable.

B.  RS'S LIVING ENVIRONMENT WITH DANIEL

Daniel argues that the trial court's finding that "'[RS's] current living situation is harmful to [her] physical, mental, or emotional health'" is not supported by substantial evidence.  Br. of Appellant at 2.  He claims that if these findings relate to his sexual thoughts about RS, they are not supported by substantial evidence.  We hold that this finding is supported by substantial evidence and the findings support the court's conclusion that a modification was warranted under RCW 26.09.260(2)(c).

The trial court based its finding that RS's living environment with Daniel was unsafe and detrimental to her health on Daniel's incident of threatening to hit Liberty in 2015 and his sexual thoughts of RS.  The court stated that it placed particular emphasis on "[the] episode of domestic violence perpetrated against [Liberty] by [Daniel], and a troubling sexual episode involving [Daniel] and [RS] which has not been addressed professionally," and Daniel's manipulation of the police to accomplish his ends.  CP at 68.

As to Daniel's sexual thoughts of RS, the trial court was troubled by the sexual thoughts Daniel admitted he had while bathing RS and was also concerned that Liberty left RS in his care despite her concerns regarding his thoughts and the reports to CPS.  The court in its ruling stated that Daniel's sexual thoughts about RS had not been professionally addressed before trial.

Based on the testimony by Liberty's grandmother who observed RS engage in sexually suggestive behavior on a repeated basis, the court further concluded that Daniel had engaged in sexually inappropriate behavior with RS.  The court also noted that Daniel's text messages

17

revealed an uncommon concern for participating in the investigation by CPS in California initiated by Liberty. The court wrote, "It is unclear to the Court why [Daniel] should worry that his daughter was in danger when the investigation related to his conduct, that he should be present during any interview[,] and that she couldn't have an evaluation unless he gave permission." CP at 68.

Regarding the domestic violence incident, Daniel admitted at trial that in September 2015, he and Liberty had taken his car for a short distance from her grandparents' house and they started arguing about the parenting plan. After Liberty demanded to be returned to the house, he refused, called 911, and told the 911 operator if the police did not come, he would hit her. He claimed later at trial that he never intended to hit her but did not tell her or the police that at the time.

The court properly concluded that "[t]he threat to inflict bodily harm on an ex-girlfriend when discussing a parenting plan is domestic violence. There is no evidence of a continuing history of domestic violence, but the episode is problematic because it shows [he is] capable of manipulating both [Liberty] and the legal system to suit his own purposes. This conduct is consistent with his failure to follow a parenting plan because he did not believe it accurately reflected what he had sought." CP at 66. The parenting plan was based on Daniel's moving to California, which he did not do, and Liberty's relocation to California.

Here, the trial court properly concluded, based on its findings above, that maintaining the agreed parenting plan under which RS resided primarily with her father would be harmful to RS's physical, mental, or emotional health. Therefore, we hold that substantial evidence supported these findings, and the findings support the court's conclusion of law that a modification was warranted under RCW 26.09.260(2)(c) and that certain restrictions were also warranted under former RCW 26.09.191.

C. RESIDENTIAL PLACEMENT

Daniel argues that the findings that he is "'less likely to encourage a relationship between [Liberty] and [RS] considering his conduct related to travel to and from Denver and his failure to allow visitation with the child when he was in Southern California'" and that Liberty has a strong relationship with RS and greater potential for performance of parenting function are not supported by substantial evidence. Br. of Appellant at 2. He also argues that the court erred in concluding that Liberty was intended to be the primary custodial parent and the evidence favors him being designated as the primary parent. We hold that regardless of any error in determining who was the primary parent in the original parenting plan, substantial evidence supports the findings, and the findings support the court's conclusion of law that it was in RS's best interest to designate Liberty as the primary custodial parent.

RCW 26.09.187(3)(a) requires a trial court to consider the following when making residential provisions in a permanent parenting plan: the parent/child relationship, parents' agreements, each parent's past and potential for future performance of parenting functions, the child's emotional needs and developmental level, the child's relationships and activities, including schooling, the parents' wishes, and the parents' employment schedules. *Littlefield*, 133 Wn.2d at 52.

Here, the trial court found that Liberty was intended to be the custodial parent in the original agreed parenting plan. But the court's conclusion is at odds with the language in the parenting plan and the order of child support designating Daniel as the custodial parent.

Liberty testified that she acted as RS's primary caregiver when she was married to Daniel, although Daniel testified to the opposite and claimed to have exclusively been RS's primary

caregiver. Daniel testified that he acted as RS's primary caregiver when the parties were married and likened Liberty's interactions with RS to "babysit[ting]" and stated that "she's mostly a babysitter. That's the best way that I could explain it while I was gone." VRP (Apr. 19, 2017) at 245, 253.

Liberty's grandmother testified about her observations of Liberty's relationship with RS, particularly regarding the routines Liberty developed with RS. When asked what types of activities she witnessed Liberty and RS engaging in, she stated, "Things that . . . a mother would usually do. She would try to get her on a routine. Feeding routine. Bathing routine. Breakfast. And then when she started preschool, also a different kind of routine. The change in routine. And a little bit of disciplining also." VRP (Apr. 18, 2017) at 172. Daniel also admitted at trial that he had sexual thoughts about his daughter while bathing her.

Under RCW 26.09.187(3), the court properly considered the parties' agreement in the parenting plan that contemplated that he would relocate to California and did not do so. At the time of trial, Liberty lived in California and Daniel lived in Washington—a considerable distance that would not accommodate a joint parenting plan schedule as originally agreed. The court also considered the parties' parenting functions and future parenting abilities and its concerns regarding Daniels's conduct and failure to following the parenting plan. The court found that Liberty's relationship with RS demonstrated that she performed the majority of the parenting functions and was likely to do so in the future. The trial court further found that "[i]t is clear that the parent entitled to a majority of the time with the child was the mother." CP at 64. We do not reweigh credibility determinations, and the court properly found Liberty was the custodial parent. *Black*, 188 Wn.2d at 127.

We hold that substantial evidence supports the court's findings that Daniel was less likely to encourage a relationship between Liberty and RS, and Liberty had a stronger relationship with RS and greater potential for performance of parenting functions. We hold that the findings support the court's conclusions of law regarding the residential placement of RS with Liberty.

D.  HOLIDAYS AND SCHOOL BREAKS

Daniel argues that the trial court erred by allowing Liberty all holidays and spring breaks. As discussed above, the holiday and spring break provisions are not restrictions imposed by the trial court under former RCW 26.09.191(3)(f). We review below whether these provisions are appropriate under RCW 26.09.187(3) and hold that they are appropriate, and the court's decision was not untenable or manifestly unreasonable.

Under RCW 26.09.187(3), the court has broad discretion to enter residential provisions in a parenting plan. The court determined that Daniel's conduct seriously endangered RS's physical, mental, or emotional well-being such that a modification of the parenting plan and residential schedule was warranted. The provisions, allowing Liberty holidays and spring breaks, while allowing Daniel holidays and breaks that fall on his every other weekend visitation, are within the court's broad discretion under RCW 26.09.187(3).

The trial court was in the best position to assess the credibility, weight, and persuasiveness of the testimony. We do not disturb or reweigh the trial court's credibility determinations or evaluation of the evidence. *Black*, 188 Wn.2d at 127. We hold that these provisions are supported by substantial evidence and the findings support the court's conclusion.

ATTORNEY FEES

Liberty requests an award of reasonable attorney fees and costs on appeal under RCW 26.09.140 and RAP 18.1(b).  We hold that Liberty is entitled to an award of reasonable attorney fees and costs on appeal and grant her request.

RCW 26.09.140 states, in relevant part, that "[u]pon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs."  RAP 18.1(a) states that "[i]f applicable law grants to a party the right to recover reasonable attorney fees or expenses on review before either the Court of Appeals or Supreme Court, the party must request the fees or expenses as provided in this rule."  RAP 18.1(b) requires that a party requesting fees "devote a section of its opening brief to the request for the fees or expenses."

Here, Liberty supported her request by filing an affidavit demonstrating her need and Daniel's ability to pay based on his affidavit.  Thus, we grant her request for an award of reasonable attorney fees and costs on appeal under RCW 26.09.140 and RAP 18.1(b).

No. 51551-2-II

CONCLUSION

We affirm the trial court's orders and award Liberty reasonable appellate attorney fees and costs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

MELNICK, P.J.

GLASGOW, J.

23