IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Domestic Violence Protection Order for | No. 87675-9-I |
| GILLIAN TIMAEUS, | ORDER GRANTING MOTION TO PUBLISH |
| Respondent, | |
| and | |
| CHRIS TIMAEUS, | |
| Appellant. | |

Non-party Northwest Justice Project has moved to publish the opinion filed on June 9, 2025. Appellant Chris Timaeus and Respondent Gillian Timaeus filed answers. A panel of the court has reconsidered its prior determination not to publish the opinion for the above entitled matter, and has found that it is of precedential value and should be published.

Now, therefore it is hereby

ORDERED that the written opinion, filed on June 9, 2025, shall be published and printed in the Washington Appellate Reports.

FOR THE COURT:

_____
Judge

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Domestic Violence Protection Order for | No. 87675-9-I |
| GILLIAN TIMAEUS, | DIVISION ONE |
| Respondent, | |
| and | UNPUBLISHED OPINION |
| CHRIS TIMAEUS, | |
| Appellant. | |

SMITH, J. — Gillian and Chris Timaeus are married and share a minor child. In January 2024, Gillian petitioned for a domestic violence protection order (DVPO). Following a hearing where both parties were represented by counsel, the superior court commissioner granted the DVPO. Chris moved for revision, which the court denied. The court then granted Gillian's request for attorney fees.

Chris appeals, asserting that substantial evidence does not support the finding that he engaged in coercive control, that the commissioner erred in interpreting the term "coercive control," that the court erred in denying his motion for revision, and that the court erred in awarding Gillian fees. Finding no error, we affirm and grant Gillian's request for fees on appeal.

FACTS

Petition

Gillian and Chris Timaeus are married and share one minor child, A.T.[1]  In January 2024, Gillian petitioned for a domestic violence protection order (DVPO) against Chris.  The most recent incident Gillian alleged in her petition is that in December 2023, Chris pointed a flashlight at her and A.T. while she was nursing in the early morning.  Angry that Gillian had continued to nurse A.T. despite his instructions to the contrary, Chris asked her why she was nursing, informed her that nursing at night was the reason A.T. did not sleep through the night, and berated her for interfering with his own sleep.  Later that morning, Chris told A.T. that, "Papa doesn't get to be happy and cheerful because his wife is a selfish c[**]t."  He then refused to watch A.T. until the nanny arrived, despite the fact that he had the day off and Gillian was late for a meeting.

Gillian's petition also described a number of past incidents of domestic violence and coercive control.  In October 2023, following a disagreement, Chris stated he no longer "had the requisite trust" to remain married to Gillian.  When Gillian attempted to continue the conversation, Chris stated, "I don't give a f[**]k if we talk."  He then removed the mattress Gillian had placed for herself in her daughter's room, again calling her a "cold, unfeeling c[**]t."  Gillian had placed the mattress in A.T.'s room at her therapist's suggestion, in an attempt to avoid conflict.

---

[1]  Because the parties share a last name, we use their first names for the sake of clarity.

Also in October, Gillian described Chris's anger when she wanted to take A.T. trick or treating.  Seemingly unhappy that Gillian had made a choice as to A.T.'s costume without his input, Chris brought up Gillian's past history of abortions, berating her for being an irresponsible parent.  Her earlier decision to have an abortion meant to Chris, that she might "want to kill a[nother] child because commitment means nothing to [her.]"  This was not the first time Chris had used Gillian's reproductive choices against her.  And when Gillian took A.T. to nurse that evening, Chris berated her for "pandering to [A.T.]."  The following morning, when she could not find A.T.'s age-appropriate car seat, Gillian believed Chris had hidden the car seat to prevent her from leaving with A.T.

Gillian next recounted how Chris planned to kill her cat, told her to leave the home without A.T., and threatened to file for divorce.  In September 2023, the family cat scratched A.T. after the family dog spooked it.  Unhappy with the scratch, Chris began talking about euthanizing the cat, noting that he could call animal control but that he would rather do it in the backyard with a shovel.  He threatened to board up the office window, which was the cat's usual point of entry into the home, told Gillian to leave the home when she objected, and threatened to file for divorce.  When Gillian opened the window again, Chris called her "f[**]king daft" and told her she was "playing hardball. . . it gets a lot worse."  Gillian relayed these events to her therapist as they happened and her therapist encouraged her to call the domestic violence hotline.

Finally, Gillian described how, eight days before she filed her petition, Chris responded to a disagreement by threatening to "check[] out of life."  When

Gillian asked Chris to use his day off to watch A.T. because the nanny was sick, Chris complained this "meant he couldn't go snowboarding," and then stated "I hate this life," and "I've thought about checking out." Gillian understood this to mean that he might hurt himself.

Gillian requested that the order restrain Chris from harming Gillian and from making any contact outside of e-mail. The petition also sought an order requiring Chris to remain at least 1,000 feet away from Gillian's residence and vehicle. The initial petition did not restrain Chris's contact with A.T.

### Temporary Order

The superior court commissioner entered a temporary DVPO protecting Gillian from Chris pending a hearing on her request for a final order. The temporary order included no harm and no contact restrictions for both Gillian and A.T. It did not provide an e-mail exception to the provision of the order.

In response to Gillian's petition, Chris submitted a declaration denying most of Gillian's claims and providing alternative contexts to the actions he conceded. To support his claims, Chris submitted copies of text messages between Gillian and himself, images of A.T., and copies of Gillian's journal entries. He also introduced a declaration from a friend who spoke highly of his parenting but did not reference or dispute any assertion of domestic violence.

In reply, Gillian disputed Chris's version of events, providing further details about the incidents she described in her petition and introducing her own contemporaneous journal entries documenting Chris's behavior. She also introduced declarations from family, friends, and her therapist, who all provided

extensive documentation of Gillian's isolation as a result of the relationship with Chris. Each declaration noted the differences in her behavior and how removed she became from her normal routines.

## Hearing

In February 2024, the parties appeared for a hearing before the superior court commissioner to address a final protection order. Neither Gillian nor Chris testified; both relying on their declarations. Following a recitation of Gillian and Chris's respective arguments, the commissioner determined that Gillian was a credible witness and that although Chris indicated he did not intend to harm Gillian, he had done so. The commissioner emphasized Chris's name-calling, the flashlight, the removal of the mattress, and the threats to the cat. The commissioner specifically stated, "All of these are forms of coercive control, and as such, they cause emotional and psychological harm." The court determined that Gillian had met her burden of proving coercive control and granted the DVPO. The final order did not restrict Chris's contact with A.T. or affect custody.

## Motion for Revision

Following the grant of the order, Chris moved for revision with the superior court. The motion asserted that the commissioner had erred in granting the protection order because Chris's conduct had not sufficiently interfered with Gillian's free will and personal liberty. As Gillian's reply emphasized, however, Chris's motion failed to comply with several local rules and the statutory time limit. Based on the lack of compliance with local rules, the superior court denied Chris's motion for revision. The court then awarded Gillian attorney fees.

Chris appeals both the motion for revision and the commissioner's grant of the DVPO.

ANALYSIS

Motion for Revision

Chris asserts that the trial court erred in denying his motion for revision because he timely and properly served the motion. Because Chris did not properly serve the motion and does not challenge the trial court's findings that he did not comply with other local rules, we disagree.

We review the denial of a motion for revision for an abuse of discretion. *In re Receivership of Applied Restoration, Inc.*, 28 Wn. App. 2d 881, 890, 539 P.3d 837 (2023), review denied, 3 Wn.3d 1012 (2024) . A court abuses its discretion when its decision is " 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.' " *Applied Restoration*, 28 Wn. App. 2d at 891(internal quotation marks omitted) (quoting *MONY Life Ins. Co. v. Cissne Fam., LLC*, 135 Wn. App. 948, 952-53, 148 P.3d 1065 (2006)). Unchallenged findings of fact are verities on appeal. *Jubitz Corp. v. Dep't of Revenue*, 31 Wn. App. 2d 898, 907, 553 P.3d 700 (2024).

Pierce County local rules (PCLR) provide filing requirements specific to motions for revision. PCLR 7(a)(12). The requesting party must file the motion to revise within 10 days of the challenged order. PCLR 7(a)(12)(A). The requesting party must provide the superior court with "copies of all documents submitted by all parties that were considered by the Court Commissioner in making the decision sought to be revised." PCLR 7(a)(12). The requesting party

must "state with specificity any portion of the Commissioner's order or judgment sought to be revised." PCLR 7(a)(12)(C). And when the commissioner's order is based on sworn testimony, Pierce County requires a transcript of the proceedings. PCLR 7(a)(12)(e).

In addition to filing requirements, Pierce County local rules detail the procedure required for appropriate service. PCLGR 30(b)(5), 30(b)(6)(B). All represented parties must serve all documents through the e-filing system at the time of filing. PCLGR 30(b)(5).

Here, Chris does not challenge the trial court's findings that he failed to provide the court with copies of all considered documents, that he failed to provide a transcript of the proceedings, or that he failed to specify the portions of the order for which is sought revision.[2] In failing to challenge those findings, Chris acknowledges his failure to comply with local rules.

The only finding that Chris does challenge is the superior court's finding that he failed to properly serve his motion. Chris states that the court erred because it "claims that he failed to 'properly serve' his motion with[in] ten days of the hearing, but the rules do not require service with[in] ten days of the hearing." The court did not err. Chris filed his motion for revision on February 29, 2024. His attorney filed notice of intent to withdraw on March 4, 2024. Therefore, Chris

_____

[2] This court has concern that denying the motion for revision based on lack of specificity is inappropriate because Chris challenges the entirety of the order. Further specificity would not provide any more clarity on his challenge, as he asserts not enough evidence supports the protection order in general. But given Chris's failure to challenge the trial court's finding and his failure to comply with other local rules, we nonetheless conclude that the trial court did not abuse its discretion.

7

was represented at the time of filing. Because he was represented, Pierce County rules required that Chris serve his motion through the count e-filing system. He did not do so.

Given the unchallenged findings that Chris failed to comply with local rules and the lack of appropriate service, the trial court did not abuse its discretion in denying Chris's motion for revision.

### Substantial Evidence

Chris next contends that the commissioner erred in granting the DVPO because substantial evidence does not support the finding that Chris engaged in coercive control. Because sufficient evidence exists to persuade a fair-minded person that Chris engaged in coercive control, we again disagree.

We review a trial court's decision to grant or deny a request for a protection order for an abuse of discretion. *Cox v. Fulmer*, 31 Wn. App. 2d 485, 489, 555 P.3d 431 (2024). A court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons. *In re Marriage of Chandola*, 180 Wn.2d 632, 642, 327 P.3d 644 (2014). Our review focuses on the actions of the trial court, rather than the commissioner, because a trial court's order on a motion for revision supersedes any rulings by a commissioner. *Cox*, 31 Wn. App. 2d at 489. When a trial court denies a motion for revision, it adopts the commissioner's findings, conclusions, and rulings as its

8

own.  *State ex. rel. J.V.G. v. Van Guilder*, 137 Wn. App. 417, 423, 154 P.3d 243 (2007).[3]

We review a trial court's findings of fact for substantial evidence, generally deferring to the trier of fact on questions of witness credibility, conflicting testimony, and persuasiveness of the evidence.  *In re Vulnerable Adult Petition for Knight*, 178 Wn. App. 929, 936-37, 317 P.3d 1068 (2014).  Evidence is substantial when sufficient to persuade a fair-minded person of the truth of the matter asserted.  *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017).  "Competent evidence sufficient to support the trial court's decision to grant . . . a domestic violence protection order may contain hearsay or be wholly documentary."  *Blackmon v. Blackmon*, 155 Wn. App. 715, 722, 230 P.3d 233 (2010).

RCW 7.105.225 directs courts to grant protection orders if they find, by a preponderance of the evidence, that "the petitioner has been subjected to domestic violence by the respondent."  Domestic violence includes "coercive control," defined as "a pattern of behavior that is used to cause another to suffer physical, emotional, or psychological harm, and in purpose or effect unreasonably interferes with a person's free will and personal liberty." RCW 7.105.010(4)(a).  When determining whether interference is unreasonable,

---

[3] Here, the trial court denied Chris's motion without reaching the merits. Based on the court's language, it is difficult to determine whether the court intended to adopt the commissioner's order as its own or simply decided not to reach the issue because the motion was not properly before the court.  Despite that lack of clarity, because the trial court denied the revision, we proceed as though it adopted the commissioner's order.

the court considers the context and impact of the behavior "from the perspective of a similarly situated person." RCW 7.105.010(4)(a).

The statute also provides a variety of specific examples of coercive control, including communicating an intent to harm the other party's pets, an intent to attempt suicide or other acts of self-harm, or engaging in reproductive coercion. RCW 7.105.010(4)(a)(i)(A), -(E)(I), -(E)(III), -(H). Other broader examples include, "[c]ausing dependence, confinement, or isolation of the other party from friends, relatives, or other sources of support"; "[c]ontrolling, exerting undue influence over, interfering with, regulating, or monitoring the other party's movements"; and "[e]ngaging in psychological aggression, including inflicting fear, humiliating, degrading, or punishing the other party."
RCW 7.105.010(4)(a)(ii), (iv), (vi).

Gillian asserts that we need not address the merits of Chris's challenge to the commissioner's order at all because this appeal arises from the superior court's ruling on revision, not the granting of the DVPO. But because the trial court denied Chris's motion, it adopted the commissioner's findings, conclusions, and rulings as its own. Because the original order stands, and Chris appealed the original order in addition to the denial of his motion for revision, we next consider the merits of his argument.

Chris maintains that the commissioner abused their discretion in granting Gillian's petition because Gillian failed to meet her burden of providing domestic violence by a preponderance of the evidence. We disagree and conclude that substantial evidence supports the commissioner's finding that Chris subjected

Gillian to domestic violence. Through her initial petition and supplemental declarations, Gillian provided significant evidence that Chris's behavior met both the express examples and broader concepts detailed in the statute.

Beginning with the express examples, Gillian documented Chris's threats to her cat, his statements indicating that he might harm himself, and his repeated degradation based on her past reproductive choices. Taking each in turn, Gillian provided substantial evidence that Chris's behavior met the clear examples of coercive control outlined in the statute.

First, Gillian described Chris's threats to kill her cat in the backyard with a shovel. She also recounted how when she opened her office window, the cat's usual point of entry, Chris swore at her, slammed the window shut, and informed her that things could get a lot worse.

Gillian then detailed how Chris described feeling lonely and despondent, stating "I hate this life," and "I've thought about checking out." Gillian connected this behavior to Chris's expression of emotional neglect within the marriage and believed he would hurt himself. He declined Gillian's suggestions to return to therapy.

Gillian also documented how Chris repeatedly brought up Gillian's past history of abortions in arguments. He regularly used Gillian's past choices, which conflicted with the choice he would have made, as evidence that she was an irresponsible parent, that she might "want to kill a child because commitment means nothing to [her]," and seemingly as a trump card simply to win an argument.

11

Turning to the broader examples listed in the statute, Gillian also provided extensive evidence that Chris attempted to monitor and regulate her movements and behavior and that he regularly attempted in inflict fear and humiliation, sometimes in front of their child.

The regulation and control took multiple forms. Describing the most recent incident of coercive control, Gillian stated that Chris pointed a flashlight at her while she was nursing because he no longer wanted her to nurse their child. The flashlight beam and Chris's anger at finding Gillian nursing exemplify Chris's attempts to regulate Gillian's behavior. Removing the bed Gillian placed in A.T.'s room also impacted Gillian's ability to nurse, as well as to her ability to maintain her own space.

In addition to attempting to regulate Gillian's nursing, Gillian provided evidence that Chris attempted to regulate both her time and movement. To the former, Gillian described multiple incidents where Chris refused to watch A.T., despite having time off work. This forced Gillian to either miss or arrive late to her own obligations. And to the latter, Gillian indicated that Chris hid the age-appropriate car seat, making it impossible for Gillian to leave the home with A.T. Gillian only located the car seat when she suggested that all three do something together.

And as detailed above, most incidents involved some sort of fear or humiliation. Gillian provided substantial evidence, including contemporaneous journal entries, documenting Chris's regular use of derogatory language. And as exemplified by Chris informing A.T. that "Papa doesn't get to be happy and

cheerful because his wife is a selfish c[**]t," that humiliation took place in front of and was sometimes directed to their child.

Gillian's friends and family then provided documentation of Gillian's isolation as a result of her relationship with Chris. Her mother, brother, close friend, and therapist all noted the differences in her behavior and how removed Gillian became from her normal life and routines over the course of her relationship, evidencing Chris's attempts to isolate Gillian.

Chris provides alternative contexts for the evidence that Gillian laid out, often stating that she misconstrued or misrepresented the circumstances. But the commissioner expressly found Gillian to be a credible witness and that significant evidence corroborates Gillian's statements.

Given the extent of Gillian's evidence and the commissioner's clear determination that Gillian was a credible witness, substantial evidence supports the conclusion that Chris's behavior met the definition of coercive control under RCW 7.105.010.

Statutory Interpretation

Chris then asserts that, in granting the DVPO, the commissioner erred in interpreting RCW 7.105.010. We conclude that the commissioner appropriately interpreted the statute.

We review statutory interpretation de novo. *DeSean v. Sanger*, 2 Wn. 3d 329, 334-35, 536 P.3d 191 (2023). "The goal of statutory interpretation is to give effect to the legislature's intentions." *DeSean*, 2 Wn.3d at 335. In determining the plain meaning of a statute, we look to the text of the statute, as well as its

13

broader context and the statutory scheme as a whole. *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010). Only if the plain text is susceptible to more than one interpretation do we turn to statutory construction, legislative history, and relevant case law to determine legislative intent. *Ervin*, 169 Wn.2d at 820.

1. Specific Findings

First, Chris alleges that the commissioner made no findings that he engaged in a "pattern of behavior" or that his behavior "unreasonably interfered" with Gillian's "free will and personal liberty," and therefore erred in finding that domestic violence by coercive control existed. Because Chris cites no authority requiring the commissioner to make such an express finding on the record, we disagree and affirm.

RCW 7.105.225(5) requires the court to expressly state the reasons for its decision only when it declines to issue an order of protection.

Here, the commissioner granted Gillian's petition for a DVPO. Therefore, the commissioner was not required to state in writing the particular reasons for their decision. Chris provides no authority to the contrary. And as evidenced above, ample evidence supports the commissioner's findings. We conclude that the commissioner appropriately interpreted the statute and imposed the order.

2. Intent Requirement

Chris also claims that, because the pattern of behavior needs to be "used to cause another to suffer," the commissioner's determination that Chris did not intend to cause harm undermines a finding of coercive control. He then states that we should find that "some greater level of intent is required" to find a party

14

guilty of coercive control. Because Chris misrepresents the commissioner's finding and the plain language of the statute does not require intent, we again disagree and do not impose an intent requirement that the statute does not provide.

Generally, protection orders based on conduct that "society has a strong interest in deterring" do not contain mens rea requirements. *DeSean*, 2 Wn.3d at 338. And "where the legislature intends to include a mens rea requirement, it does so." *DeSean*, 2 Wn.3d at 337. In considering petitions for protection orders, we "presume that the omission of intent or knowledge in certain protection orders, and its inclusion in others, is deliberate." *DeSean*, 2 Wn.3d at 338.

To reiterate, RCW 7.105.010(4)(a) defines coercive control as "a pattern of behavior that is used to cause another to suffer physical, emotional, or psychological harm, and in purpose *or effect* unreasonably interferes with a person's free will and personal liberty." (Emphasis added.)

Chris first suggests that the commissioner's finding that he did not intent to harm Gillian undermines the finding of coercive control. But Chris misrepresents the commissioner's finding. Chris states that the commissioner found that "Chris 'had no intent to harm his spouse or engage in coercive control.' " But the commissioner actually determined that "[Chris] *indicated* he had no intent to harm [his] spouse or engage in coercive control." (Emphasis added.) The finding only details what Chris indicated his intent to be, not what his intent actually was.

Chris then maintains that the "use" language in the statute implies an intent requirement. But the legislature did not define coercive control as a pattern of behavior that is used by the respondent with an intent to cause the petitioner harm. Rather, the legislature focused on whether the petitioner was subject to a particular kind of harm, regardless of whether the respondent intended to use it that way. The rest of the definition then states that coercive control is a pattern that "in purpose *or effect* unreasonably interferes." Therefore, the effect of the conduct is sufficient to prove coercive control, separating effect from purpose or intent. And in determining whether the interference is unreasonable, the court looks to the context and impact of the pattern of behavior from the perspective of a similarly situated person," indicating an objective focus on the conduct and petitioner rather than the respondent's mens rea. The examples provided in the statute compound this focus, emphasizing an abuser's objective conduct and the effects on the victim.

Considering the plain language of the statute and working under the presumption that that the omission of an intent requirement is intentional, we conclude that the statute does not require a finding of intent. Therefore, even if Chris had not misrepresented the commissioner's finding, his intent or lack thereof, is irrelevant.

### Attorney Fees

Lastly, Gillian requests attorney fees on appeal. We award fees.

RAP 18.1 permits a party to request attorney fees on appeal where applicable law grants them that right. We may award attorney fees where

16

allowed by statute, rule, or contract. *Aiken v. Aiken*, 187 Wn.2d 491, 506, 387 P.3d 680 (2017). And "if attorney fees are allowable at trial, the prevailing party may recover fees on appeal." *Aiken*, 187 Wn.2d at 506. Under RCW 7.105.310(1)(j), courts have discretion to "reimburse the petitioner for costs incurred in bringing the [domestic violence protection order] action, including reasonable attorneys' fees."

We affirm and grant Gillian's request for fees.

WE CONCUR: